[No. B233087. Second Dist., Div. Three. Oct. 18, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
ERASTO ISLAS et al., Defendants and Appellants.

118

## COUNSEL

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant Erasto Islas.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant Pablo Alexander Giron.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Erasto Islas and Pablo Alexander Giron appeal the judgments entered following their conviction by jury of first degree burglary with a person present and five counts of false imprisonment by violence or menace, a felony. (Pen. Code, §§ 459, 667.5, subd. (c)(21), 236, 237, subd. (b).)[1] The

---

[1] Subsequent unspecified statutory references are to the Penal Code.

jury found each offense had been committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The trial court sentenced Islas and Giron to state prison for burglary and imposed concurrent terms on the false imprisonment counts.

Islas and Giron contend the convictions of felony false imprisonment must be reduced to misdemeanors because the evidence does not establish violence or menace. As a result, the burglary convictions, which were based on entry with the intent to commit felony false imprisonment, must be reversed or reduced to trespass. They also contend the concurrent terms imposed on the false imprisonment counts should have been stayed.

We reject the attack on the sufficiency of the evidence to support the convictions of felony false imprisonment. The evidence indicated Islas, Giron and numerous other gang members were congregating in front of an apartment building in downtown Los Angeles that was a gang "stronghold." When police officers arrived, the gang members ran into the building. Islas and Giron climbed up a ventilation shaft and entered the bathroom of a studio apartment occupied by Teresa Salado, an 11-year resident of the building, and her four daughters, ages 13 to four years. Islas and Giron were shirtless with their gang tattoos exposed; their heads were shaved and they wore baggy pants. One put his finger to his mouth and told Salado to hide them from the police. Giron turned off the lights in the apartment. Salado and her daughters huddled together while Islas stood and Giron sat on a couch six feet from them. When Salado said she was scared, Islas and Giron told her they were not going to harm her. After 15 minutes, police officers knocked on the door. Islas told Salado to pretend she was Giron's aunt. Giron answered the door and was pulled from the apartment by the officers. Islas was found hiding under a pile of clothes.

Although Islas and Giron used no weapons, did not touch Salado or her children and issued no express threat of harm, the evidence was sufficient to support the jury's finding the false imprisonment was effected by menace, i.e., an express or implied threat of harm. Thus, we affirm the convictions of felony false imprisonment and burglary.

However, it appears Islas and Giron are correct in asserting the terms imposed for false imprisonment must be stayed. Accordingly, the judgments are affirmed as modified to stay the terms imposed on counts 2 through 6.

## FACTS AND PROCEDURAL BACKGROUND

1.   *The prosecution's evidence.*

  a.   *Testimony of the arresting officers.*

On March 25, 2010, at approximately 1:00 a.m., Los Angeles Police Officer Mario Botello received a radio call regarding gang members in front of an apartment building at 916 Georgia Street in downtown Los Angeles near Staples Center. As Botello and his partner arrived at the location, eight to 10 gang members ran into the building. Botello drove to the rear of the building but the fleeing gang members did not exit. Botello called for additional units, then set up a perimeter and entered the building to extract the gang members. Four individuals ran from the building and were taken into custody. Botello and his partner entered the basement and found an individual hiding in a furnace area. They next illuminated the opening of a four-by-four-foot ventilation shaft that went from the basement to the roof. The mesh cover on the shaft opening was bent aside and the officers could see the legs of four individuals in the shaft. Two females exited and were taken into custody. The other two individuals climbed upward in the shaft.

Botello obtained keys to the apartments, entered apartment 101 and found it was unoccupied. Botello noticed the bathroom window, which opened into the ventilation shaft, was missing its vent louvers. Botello looked across the shaft and saw the bathroom window of apartment 102, which also opened into the ventilation shaft, did not have a screen. Botello went to apartment 102 and knocked on the door. After a few minutes, Giron opened the door slightly. Botello could see Giron was not wearing a shirt, his shorts were dirty and he had "4" and "2" tattooed on his stomach. Botello kicked the door open and pulled Giron from the apartment with the assistance of Officer Juan Ibarra.

Botello entered the one-room apartment, which was approximately 14 feet square, and saw Teresa Salado standing against the wall in the corner of the room next to a bed on which four children were huddled with blankets over them. Salado looked at Botello with a blank stare and motioned with her head to her left. Botello looked behind the couch and saw a shirtless male Hispanic, Islas, under a pile of clothing. Islas had to be pulled from behind the couch and walked from the apartment. The bathroom window screen was lying in the bathtub.

Officer Ibarra interviewed Salado outside her apartment a few minutes after Islas and Giron were detained. Salado made no eye contact with Ibarra and was shaking with fear. Salado said that when she awoke, she turned on the

light in the apartment and heard noises in the bathroom. A male Hispanic with no shirt and gang tattoos on his upper body, Giron, looked at her, put his finger to his lips and said, "don't move or say anything." She then observed a second male Hispanic with no shirt and gang tattoos on his upper body behind the first male. Giron turned the apartment lights off.

b. *Testimony of Teresa Salado and her daughters.*

Teresa Salado testified she had lived in apartment 102 for 11 years. The apartment has one room, a closet and a bathroom. When Salado went to bed, she left the bathroom light on. She was awakened by noises outside the building that sounded like someone running. About an hour later, Salado heard banging on the back wall of her apartment. She got out of bed and saw two "gang members," Islas and Giron, standing in her bathtub. They were wearing baggy pants and their heads were shaved. Salado immediately was afraid they might do something to her or her daughters. Salado testified Islas told her, in Spanish, to hide them from the police. Salado felt that if she ran from the apartment, Islas and Giron would attack her or her daughters. Salado's oldest daughter stood next to her and the other children huddled in a bed. Islas remained standing and Giron sat on the couch facing Salado. Each was about six feet from Salado and her daughters. Islas and Giron talked to each other in English, which Salado does not understand. Islas and Giron were in the apartment for about 15 minutes. Salado stayed by the bed with her children until the police arrived. Islas and Giron said they did not want to hurt Salado but only wanted her to hide them. Salado did not believe Islas and Giron were not going to harm her.

When the police knocked on the door, Islas told Salado to pretend she was his aunt and Giron told Salado not to open the door. Salado feared that if she opened the door, she would be harmed. After two or three minutes, Giron opened the door and police officers entered the apartment.

Islas and Giron were dirty and appeared to be scared. Neither man threatened Salado or touched her. At trial, one year after the incident, Salado testified Islas and Giron wore shirts when they entered her apartment. Salado also testified she remained in fear that Islas and Giron might harm her or her daughters if they were released.[2]

Salado's 13-year-old daughter, Carla, testified she was awakened by people screaming outside. Her mother told her to lie on the floor to avoid bullets that might enter the window of the apartment. While on the floor, Carla heard

---

[2] The trial court excluded evidence that Islas's mother had been convicted of attempting to dissuade a witness, Salado. The trial court found the evidence unduly prejudicial absent some indication Islas's mother had acted at Islas's behest.

noises in the bathroom. When her mother went to check, "two gangsters" entered the bathroom through the window. Carla feared her mother might refuse to hide the gangsters and they would shoot her or do something to her. Carla moved into her sisters' bed and held onto her mother because she was scared and nervous.

Salado's nine-year-old daughter, Bertha, testified she did not want to look at the men and was afraid they would do something bad to them because they "looked like criminals."

### c. Testimony of the gang expert.

Los Angeles Police Officer Francisco Martinez testified Islas and Giron are known members of the "42nd Little Criminals gang." Islas and Giron each have four or five gang tattoos and both have "42" tattooed on their stomach. The gang was established more than 10 years ago in the area of 42d Street and Broadway but migrated to the area near Staples Center. The gang has approximately 80 members. The primary activities of the gang are terrorizing the community, sale of heroin, robbery and murder. The gang intimidates by tagging buildings and causing citizens to fear retaliation if a crime is reported. The gang's territory has been decreased by renovation of the downtown area which has resulted in the demolition of many buildings. The apartment building at 916 Georgia Street is a "stronghold" of the gang. Gang members believe they can commit crimes with impunity at the location. Graffiti on the building included a "roll call" with the monikers of Islas and Giron.

In response to a hypothetical question based on the facts of this case, Martinez opined the charged offenses had been committed in association with and for the benefit of the gang. Martinez based this opinion, in part, on the exposure of the gang tattoos which told the victims, "I'm a gang member," thereby instilling fear and advising the victims to cooperate or they would be harmed.

## DISCUSSION

1. *Substantial evidence supports the convictions of felony false imprisonment and burglary.*

   a. *The law of false imprisonment.*

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "False imprisonment is a misdemeanor unless it is 'effected by violence, menace, fraud, or deceit,' in which case it is a felony."

(*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490 [77 Cal.Rptr.3d 77], quoting § 237, subd. (a).) "All that is necessary to make out a charge of false imprisonment, a misdemeanor, is that 'the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts [together with the requisite intent to confine] which such individual fears to disregard.' [Citations.] To raise the offense to a felony, violence or menace, which may or may not be life endangering, or fraud or deceit, which presents no present significant danger to the victim, must be established. [Citation.]" (*People v. Haney* (1977) 75 Cal.App.3d 308, 313 [142 Cal.Rptr. 186].) "Menace is a threat of harm express or implied by words or act. [Citations.]" (*People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1359 [103 Cal.Rptr.3d 864].) "An express threat or use of a deadly weapon is not necessary." (*People v. Wardell, supra,* 162 Cal.App.4th at p. 1491.)

### b. *Islas's and Giron's contentions.*

Islas and Giron contend their conduct in asking Salado to hide them from the police constituted only misdemeanor false imprisonment, that is, an exercise of express or implied force which compelled Salado and her daughters to stay where they did not wish to stay. They assert the evidence did not demonstrate menace, i.e., an express or implied threat to do harm. They note there was no use of a weapon. (Cf. *People v. Fosselman* (1983) 33 Cal.3d 572, 579 [189 Cal.Rptr. 855, 659 P.2d 1144] [defendant held a knife to the back of the victim]; *People v. Wardell, supra,* 162 Cal.App.4th at p. 1491 [defendant held a gun while ordering victim from room to room]; *People v. Reed* (2000) 78 Cal.App.4th 274, 281 [92 Cal.Rptr.2d 781] [a gun was placed against the head of each of three victims and one victim was pistol whipped].)

Also, they did not touch the victims. (Cf. *People v. Dominguez, supra,* 180 Cal.App.4th at p. 1359 [defendant carried a four-year-old victim down a flight of steps and outside the gate to her apartment complex]; *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513 [69 Cal.Rptr.3d 585] [defendant grabbed the hood of a one girl's jacket and placed his hands on the back of the girl and her younger companion]; *People v. Castro* (2006) 138 Cal.App.4th 137, 143 [41 Cal.Rptr.3d 190] [defendant pulled a teenage girl toward his car].)

They issued no verbal threats to harm the victims. (Cf. *People v. Raley* (1992) 2 Cal.4th 870, 908 [8 Cal.Rptr.2d 678, 830 P.2d 712] [defendant threatened to beat child victims with a belt]; *People v. Aispuro, supra,* 157 Cal.App.4th at p. 1513 [defendant threatened to " 'do something' " if the victims did not comply with his demands]; *People v. Bamba* (1997) 58 Cal.App.4th 1113, 1124 [68 Cal.Rptr.2d 450] [defendant stated his intention

to kill the victim].) They did not act in a hostile manner and they told Salado they were *not* going to harm her or her children.

Islas and Giron conclude there was insufficient evidence of menace to support the jury's finding Islas and Giron committed felony false imprisonment. Thus, the false imprisonment convictions must be reduced to misdemeanors and the burglary convictions, which were based on entry with the intent to commit felony false imprisonment, must be set aside.

### c.   *Standard of review.*

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931].) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) The standard of review is the same in cases in which the People rely primarily upon circumstantial evidence. (*Ibid.*; *People v. Bradford* (1997) 15 Cal.4th 1229, 1329 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

### d.   *The evidence supports the convictions of felony false imprisonment.*

We find evidentiary support for the convictions of felony false imprisonment in the repeated criticism of *People v. Matian* (1995) 35 Cal.App.4th 480 [41 Cal.Rptr.2d 459], a case that reduced a conviction of felony false imprisonment to a misdemeanor. In *Matian*, the defendant was convicted of sexual battery by restraint, felony false imprisonment and genital penetration with a foreign object. The published portion of the opinion addressed only the false imprisonment conviction. *Matian* stated: "The evidence supporting the conviction for felony false imprisonment consists of the just completed sexual assaults during which appellant squeezed [the victim's] breast sufficiently hard to cause her pain, and possibly even bruising." (*Id.* at p. 485.) When the victim prepared to leave, "[a]ppellant then grabbed her arm and yelled at her not to go. He yelled at her, 'nothing happened' and told her to go wash her face. She then retreated to a chair and appellant went into an office nearby within view of [the victim]. Each time she got up from her chair, appellant glared at her and got up out of his chair to approach her. She testified she was afraid, did not want him to touch her again and sat back down." (*Ibid.*)

Although *Matian* defined menace as an express or implied threat of harm, it found reported decisions that had upheld convictions of felony false imprisonment by menace generally involved the use of a deadly weapon or verbal threats of harm. (*People v. Matian, supra,* 35 Cal.App.4th at pp. 485–486.) Based thereon, *Matian* held: "The only evidence of 'menace' or 'implied threat of harm' in this case would have to be based on appellant's earlier sexual assaults causing pain and possible injury and later glaring at her while getting out of his chair and approaching her each time she tried to leave. Based on the foregoing authorities however, this evidence is inadequate to establish an express or implied threat of harm. There was no evidence of a deadly weapon. Nor is there anything in the record to indicate the defendant ever verbally threatened [the victim] with additional physical harm. Similarly, there was no evidence to suggest appellant raised his fist or otherwise made any threatening movements suggesting harm each time [the victim] got out of the chair to leave. [¶] Based on the lack of evidence of either violence or menace in restraining [the victim] against her will, we must reverse appellant's conviction for felony false imprisonment." (*Id.* at pp. 486–487.)

The result in *Matian* has been criticized for suggesting menace requires either a weapon or a direct threat to sustain a conviction of felony false imprisonment. *People v. Castro, supra,* 138 Cal.App.4th 137, stated it had "no problem" concluding the evidence in *Matian* "supported the conviction for felony false imprisonment by menace, if not violence." (*People v. Castro, supra,* at p. 143.)

*People v. Aispuro, supra,* 157 Cal.App.4th 1509 found the conduct of the defendant in *Matian* "constituted a threat of harm to his victim, even though he did not specifically say to the victim, 'If you leave I'm going to physically harm you,' and even though he did not raise his fist or display a deadly weapon." (*People v. Aispuro, supra,* at p. 1513.)

*People v. Wardell, supra,* 162 Cal.App.4th at page 1491, agreed with the criticism of *Matian* in *Castro* and *Aispuro* and similarly held "[a]n express threat or use of a deadly weapon is not necessary" to sustain a conviction for false imprisonment by menace. (*People v. Wardell, supra,* at p. 1491.) Rather, a jury may reasonably find a defendant committed false imprisonment by menace if the "defendant's acts or words expressly or impliedly threatened harm . . . ." (*Ibid.*)

■ Based on the criticism of *Matian* in *Castro, Aispuro* and *Wardell,* it is clear the absence of an express threat, weapons or physical contact with the victim is not determinative. As noted in *Aispuro,* "An express or implied threat of harm does not require the use of a deadly weapon or an express

verbal threat to do additional harm. Threats can be exhibited in a myriad number of ways, verbally and by conduct." (*People v. Aispuro, supra,* 157 Cal.App.4th at p. 1513.)

Here, Salado and her 13-year-old daughter heard noises indicating police activity outside the apartment building about an hour before Islas and Giron entered the apartment. Salado told her daughter to lie on the floor to avoid being struck by flying bullets, thereby indicating the dangerousness of the neighborhood and the situation. When Salado heard noises at the back wall of her apartment, she turned the apartment light on and saw Islas and Giron in her bathroom. Upon seeing the intruders, Salado and her daughters were terrified. Salado testified Islas and Giron looked like "gang members," Salado's 13-year-old daughter repeatedly referred to Islas and Giron as "gangsters," and Salado's nine-year-old daughter called them "criminals."

Islas put a finger to his mouth and "told" Salado to hide them from the police. Giron then turned off the lights in the apartment. Islas remained standing while Giron sat on the couch, both about six feet from Salado and her children in the 14-by-14-foot apartment. This conduct, which occurred in an apartment building that was one of the gang's few remaining strongholds, coupled with the display of gang tattoos, constituted menace. As the prosecutor argued to the jury, the exposed tattoos implied, "you better do as we tell you to do or else."

The prosecutor's argument in this regard was supported by the testimony of the gang expert who indicated the gang intimidated law-abiding citizens by tagging buildings and causing residents to fear retaliation if a crime were reported. The expert indicated members of the gang believed they could commit crime with impunity at the apartment building. The expert testified the exposure of gang tattoos told the victims, "I'm a gang member," instilled fear, and advised the victims to cooperate or be harmed.

Islas argues there is no evidence indicating Salado and her daughters recognized his tattoos as gang tattoos or interpreted the tattoos as an implicit threat of harm. However, Salado had been a resident of the apartment building for 11 years. It reasonably can be inferred she was aware of the gang activity in the building and the neighborhood, which included sale of heroin, robbery and murder. Further, Islas and Giron each had "4" and "2" tattooed prominently on their exposed upper bodies, immediately identifying them as members of the gang that controlled the building.

The statement Islas and Giron would not harm Salado must be evaluated in context. As the prosecutor argued at trial, there was no reason for Islas and Giron to say they were not going to harm Salado or her daughters "unless the

message was, if you don't comply, you will get hurt." Salado testified she did not believe Islas and Giron when they said they were not going to harm her and she repeatedly testified she feared the intruders would harm her or her children if she did not comply. Officer Ibarra testified Salado was shaking with fear and was unable to make eye contact when he spoke to her shortly after the incident.

Additional evidence of Salado's fear can be found in her recantation of her initial statement to Officer Ibarra that Islas and Giron were shirtless with exposed gang tattoos on the night of the incident. Also, Salado testified she continued to fear Islas and Giron might be released and harm her or her daughters. This fear derived, at least in part, from the display of tattoos indicating Islas and Giron were members of the gang that considered the apartment building its stronghold. To suggest Salado, an 11-year resident of the building, and her children did not recognize the gang tattoos as threatening disregards the evidence.

Giron suggests the subjective fear experienced by the victims is not relevant in determining the sufficiency of the evidence because menace must be established by the words and acts of the defendant. In support of this assertion he cites *People v. Haney, supra,* 75 Cal.App.3d at page 313, and *Boyd v. City of Oakland* (N.D.Cal. 2006) 458 F.Supp.2d 1015, 1053. However, at the indicated page, *Haney* states only that menace may be accomplished by words or acts. *Boyd v. City of Oakland* is a civil case in which summary judgment was granted for failure to provide admissible evidence demonstrating a triable issue of material fact on a claim of false arrest. Neither case states a victim's fear is an irrelevant consideration in determining whether menace has been shown.

Indeed, the victim's fear frequently is mentioned in cases that address whether an express or implied threat of harm has been proven in a felony false imprisonment case. (See, e.g., *People v. Reed, supra,* 78 Cal.App.4th at p. 281 [two victims who were not pistol-whipped believed they were going to be killed]; *People v. Bamba, supra,* 58 Cal.App.4th at p. 1119 [the officer who came to the victim's rescue described her as shaking and disheveled].) Thus, contrary to Giron's assertion, a jury properly may consider a victim's fear in determining whether the defendant expressly or impliedly threatened harm.

Finally, Islas asserts the record shows the jury struggled with the issue of menace. On the second day of deliberations, the jury asked if menace could "be defined as the intention to continue to falsely imprison a witness/victim after she has displayed fear?" The trial court responded: "The simple answer to that question is no. Menace is defined as follows: 'It is an express or

implied threat to do harm.' " Shortly thereafter, the foreperson indicated the jury had not reached verdicts. In response to questions from the trial court, three jurors indicated there was some possibility of a verdict with further deliberations. The trial court asked the jury to reacquaint itself with CALCRIM No. 252, defining general intent, and indicated false imprisonment is a general intent crime. The next morning, the jurors reached verdicts.

However, Islas does not claim any error in these proceedings or that the trial court misadvised the jury. The fact the jury struggled with the evidence and did not reach a verdict quickly does not mean the evidence was insufficient to support the convictions.

■ In sum, the evidence permitted the jury to find Islas and Giron controlled the situation, made themselves comfortable in Salado's home, created a climate of fear and intimidation and coerced the victims into cooperating with their demands through an implied threat of harm. Given the gang evidence, the jury properly could conclude Islas and Giron would take whatever action was necessary to avoid capture. Thus, the evidence supports the reasonable conclusion Islas and Giron falsely imprisoned the victims by menace, i.e., an express or implied threat of harm.

### e. *Sufficiency of the evidence of burglary.*

Because the evidence supports the convictions of felony false imprisonment, the assertion the burglary lacked an underlying felony must be rejected.

Islas also contends, in a perfunctory manner, the evidence does not support the finding he intended to commit felony false imprisonment when he entered the bathroom or when he entered the living room. Assertions unsupported by authority or reasoned argument need not be considered. (See *People v. Stanley, supra,* 10 Cal.4th at p. 793.)

Even if this rule is overlooked, it is clear the jury reasonably could conclude Islas and Giron entered Salado's illuminated bathroom, rather than the bathroom of apartment 101, which was unoccupied, because they intended to coerce the occupants of apartment 102 into hiding them from the police. Alternatively, the jury could conclude Islas and Giron harbored the intent to commit felony false imprisonment when they walked from the bathroom into the living room after seeing Salado and her children. (See *People v. Sparks* (2002) 28 Cal.4th 71, 73 [120 Cal.Rptr.2d 508, 47 P.3d 289] [entry into room inside house sufficient to support burglary conviction even if that intent was formed after entry into house].)

Thus, the evidence supports the burglary convictions.

## 2. *The concurrent terms for false imprisonment counts must be stayed.*

Islas and Giron contend the concurrent terms imposed on the five counts of false imprisonment should have been stayed. It appears this contention is well taken.[3]

Section 654 provides, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

■ Section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208 [23 Cal.Rptr.2d 144, 858 P.2d 611].) Thus, if all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment. (*Ibid.*) "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]" (*People v. Adams* (1982) 137 Cal.App.3d 346, 355 [187 Cal.Rptr. 505].) When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731 [55 Cal.Rptr.2d 26, 919 P.2d 640].) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512 [80 Cal.Rptr.2d 308].)

On the facts presented, there is no sufficient evidentiary basis for an implicit finding Islas and Giron possessed independent criminal objectives when they burglarized Salado's apartment and falsely imprisoned Salado and her children.

The jury was instructed that, in order to convict Islas and Giron of burglary with a person present, the People must prove: "1. The defendant entered a room within the building; 2. When he entered a room, he intended to commit false imprisonment by violence or menace; and 3. A person or persons was present in the apartment."

---

[3] Giron's failure to raise this issue in the opening brief does not foreclose him from asserting it as he did in the reply brief. The erroneous failure to stay execution of sentence under section 654 constitutes an unauthorized sentence which is subject to correction at any time. (See *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [66 Cal.Rptr.2d 423, 941 P.2d 56]; *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 [36 Cal.Rptr.2d 627, 885 P.2d 1040].)

■ Thus, the burglary conviction was based entirely on entry with the intent to commit felony false imprisonment. When a defendant is convicted of burglary and the intended felony underlying the burglary, section 654 prohibits punishment for both crimes. (See *People v. Hester* (2000) 22 Cal.4th 290, 294 [92 Cal.Rptr.2d 641, 992 P.2d 569] [burglary and assault]; *People v. Price* (1991) 1 Cal.4th 324, 492 [3 Cal.Rptr.2d 106, 821 P.2d 610] [burglary and murder]; *People v. Le* (2006) 136 Cal.App.4th 925, 930–931 [39 Cal.Rptr.3d 146] [robbery and burglary]; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336 [71 Cal.Rptr.2d 41] [burglary and theft]; *People v. James* (1977) 19 Cal.3d 99, 119–120 [137 Cal.Rptr. 447, 561 P.2d 1135] [burglary and robbery].) Because the felony underlying the burglary conviction was felony false imprisonment, the trial court should have stayed the terms imposed for felony false imprisonment.

The People assert substantial evidence supports an implied finding Islas and Giron initially intended to flee from the police and, once inside the apartment, they intended to prevent Salado and her daughters from alerting the police to their location. Thus, Islas and Giron harbored multiple criminal objectives. However, entry with the intent to flee the police did not amount to burglary. Thus, the People's attempt to parse the situation into multiple criminal objectives is unavailing.

■ Additionally, the "multiple victim" exception to the operation of section 654 does not apply in this case. This exception arises only where the defendant commits crimes of violence against multiple victims. (*People v. Le, supra*, 136 Cal.App.4th at p. 932; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781 [39 Cal.Rptr.2d 73]; *People v. Anderson* (1990) 221 Cal.App.3d 331, 338 [270 Cal.Rptr. 516].) Burglary is not a crime of violence unless the defendant inflicted great bodily injury in the commission of the burglary or personally used a firearm. (*People v. Centers* (1999) 73 Cal.App.4th 84, 99 [86 Cal.Rptr.2d 151].) Neither situation obtains here. Also, the convictions of felony false imprisonment were based on menace, not violence. Because none of the offenses was a crime of violence, the multiple victim exception does not apply.

In sum, the concurrent terms imposed for false imprisonment, which was the intended felony underlying the burglary conviction, must be stayed.

## DISPOSITION

The judgments are modified to stay the terms imposed for false imprisonment in counts 2 through 6. As so modified, the judgments are affirmed.

Croskey, J., and Kitching, J., concurred.

Appellants' petitions for review by the Supreme Court were denied February 13, 2013, S206802. Kennard, J., was of the opinion that the petition should be granted.