Filed 9/24/14  P. v. Scott CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROGER WAYNE SCOTT,<br><br>    Defendant and Appellant. | F066446<br><br>(Super. Ct. No. 12CM2517)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Roger Wayne Scott (defendant) was charged, by first amended information, with assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1), willful infliction of corporal injury resulting in a traumatic condition on a former cohabitant within seven years of a prior conviction for the same offense (§ 273.5, subds. (a) & (e); count 2), false imprisonment by violence or menace (§ 236; count 3), intimidation of a witness by force or threatened use of force (§ 136.1, subd. (c)(1); count 4), and robbery (§ 211; count 5). It was further alleged he had suffered a prior "strike" conviction. (§§ 667, subds. (b)-(i), 1170.12, subd. (a)-(d).) A jury convicted him as charged in counts 3 and 4, acquitted him of count 5, and convicted him of the lesser included offenses of simple assault (§ 240) on count 1 and simple battery (§ 242) on count 2. Defendant admitted the prior strike conviction allegation, and was sentenced to a total of nine years four months in prison and ordered to pay various fees, fines, and assessments.

On appeal, we hold: (1) Considered in the context in which they were asked, the "was he lying" questions asked of defendant during cross-examination by the prosecutor did not constitute misconduct, and defendant was not deprived of the effective assistance of counsel; (2) Assuming a unanimity instruction should have been given with respect to count 4, omission thereof was harmless; (3) Defendant's conviction for simple assault, and his conviction for simple battery, were based on the same conduct, and simple assault is a lesser included offense of battery, so the conviction for simple assault must be reversed; and (4) Execution of sentence on the conviction for simple assault must be stayed pursuant to section 654. We modify the judgment accordingly.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

# FACTS

## I

### PROSECUTION EVIDENCE

Jolene Jones and defendant lived together off and on for 12 years, and had a child together. As of July 15, 2012, the two did not live together, but defendant came to Jones's Hanford apartment every day to visit their son. The couple had had physical confrontations six or seven times during their relationship. One, which occurred in July 2011, resulted in defendant's prior conviction for spousal abuse.

On July 15, 2012, defendant arrived at Jones's apartment in the morning. He was still there when defendant's daughter, Ambry Perez, and her boyfriend, Johnny Gonzalez, Jr., arrived that evening. Jones, Perez, and Gonzalez planned to get high on methamphetamine. Defendant objected to Jones having company at 10:00 p.m., but Jones essentially let him know he did not live there, so she was going to have company over when she wanted.

Defendant and Jones got into an argument over the subject. There was yelling, and Jones threatened to call the police on defendant. Jones went to the back door. Defendant said something to her, and put his arm around her from behind, holding her and choking her neck so she could not go near the door.

When defendant first started choking Jones, they were in the kitchen. He then tried to drag her down the hallway to the bedroom. Jones was not able to breathe while he was choking her. Jones was trying to scream, and told defendant she wanted to leave. He told her she was not going anywhere. Jones had her cell phone in her hand; defendant forcibly grabbed it from her and threw it across the room, breaking it. Defendant said he would not allow her to call the police on him, because he would lose everything he had once again.

3.

While defendant was trying to drag Jones into the bedroom, she fought to free herself. She grabbed a mirror from a stand in the hallway, reached behind herself, hit him with it, and "busted his head open."[2]

Several officers from the Hanford Police Department responded to the apartment. Officer Cavazos contacted Jones. She was very emotional, and had a difficult time speaking and answering his questions. She related that the confrontation started in the living room/kitchen area of the apartment, and that she was pulled by the hair and choked at the same time. Cavazos saw no bruising to her neck, head, or face. He did, however, notice what appeared to be a fresh bruise on her arm.[3]

Cavazos took photographs while at the apartment. In the living room, he photographed a cell phone that was broken into three pieces. He also took a photograph of an injury to defendant's head, above the right ear. Defendant pointed it out and said he received it when Jones struck him with a mirror. Defendant told Cavazos he may have broken the cell phone. Defendant also said he wanted to speak with Jones in the bedroom, so he was motioning for her to go in that direction. He grabbed her with his arms. Defendant related the argument had to do with the fact he did not appreciate Perez and Gonzalez visiting so late at night, and he also did not agree with Jones's plan to get a tattoo of her baby's name.

Cavazos also spoke to Perez that night. Perez never said Jones had gotten up in defendant's face or that Jones was the aggressor. Perez related that defendant had

---

[2] Perez recalled defendant getting "a little upset" because Jones was talking about getting a tattoo. When defendant learned of this plan, he said he did not want anybody around. Jones responded that it was her house. Jones was "kind of getting in his face" and irritating him, then they got into an argument that never left the kitchen. Jones tried to hit defendant, who was trying to fight her off. He then bear hugged her somewhat so she would not harm him or herself, whereupon Jones got a mirror and hit him in the head.

[3] According to Jones, she experienced difficulty breathing as a result of being choked. She did not know if the bruise on her arm was caused by defendant.

4.

grabbed Jones and tried to pull her toward the bedroom, and that he choked her and would not let her leave the apartment.

Pamela Tejeda testified as an expert in intimate partner violence. She explained that domestic violence "is about power and control." She also explained why victims of domestic violence often return to the relationship, and why they almost always recant their stories.

## II

### DEFENSE EVIDENCE

Defendant testified he lived in Jones's apartment, with Jones and their son, from April 2012 through the date of his arrest. Prior to the confrontation that night, defendant was asleep. Jones woke him and said Perez and Gonzalez were going to come over. Defendant responded that she should not have people coming over that late at night. He knew they were coming to do drugs and put tattoos on Jones, because Jones told him.

Jones and defendant went into the kitchen, where the back door was located, and Jones opened the door and allowed Perez and Gonzalez to come in. Defendant told them he did not need them coming in the house, bringing drugs and tattoos, at 10:30 at night.[4] Jones became angry with defendant because he did not want people to come in the house. Defendant picked her up in a bear hug from the back and turned her around. As he turned her around, she tried to grab a knife from the kitchen counter. Defendant grabbed her hand to keep her from getting the knife. He moved her from the back door and carried her into the living room, a distance of about four or five feet.[5] She grabbed a mirror off a stand and hit him in the head. He let her go.

---

[4]    Gonzalez was going to give Jones a tattoo on her arm.

[5]    Defendant denied dragging her or putting his arm around her neck. He also denied preventing Jones from leaving the home, attempting to force her to go to the bedroom, or threatening her to keep her from calling the police.

Defendant was going to pack his clothes, and told Jones he was going to take his son.[6] Jones went to the kitchen table and showed Gonzalez a picture on her cell phone of the tattoo she wanted. Defendant went into the kitchen, grabbed the phone off the table, broke it, and told Gonzalez he would not be putting any tattoos on Jones. He then went back into the bedroom to finish packing his clothes. He did not know Perez was calling the police.

Defendant admitted having a prior conviction for spousal abuse. During that incident, defendant did not batter Jones. He saw Jones punch herself in the face.[7] Defendant accepted a plea agreement because Jones, who was pregnant with their son, was having a difficult pregnancy, and defendant needed to be out of custody to help her. Once he was released, he got back together with her.

On September 24, 2012, defendant wrote Jones a letter, despite the fact he had been under a court order since July not to contact her and he knew the letter was a direct violation of that court order. In the letter, defendant referenced the Fifth Amendment and the "California Code of Perjury" section that says a domestic violence victim cannot be put in jail for not testifying.[8] He wrote the letter, which mostly contained Bible verses, because she had written him to say someone had stolen money from her.

## DISCUSSION

## I

### PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed prejudicial misconduct by asking defendant, during cross-examination, whether Cavazos was lying during his testimony.

---

[6] Defendant was trying to take the child because he did not want him to be around drugs.

[7] Jones denied hitting herself in the face or telling anyone she had done so.

[8] See Code of Civil Procedure section 1219, subdivision (b).

6.

Implicitly recognizing the issue is not cognizable on appeal because defense counsel failed to object to the questioning, defendant further says he was deprived of the effective assistance of counsel. We find no cause for reversal.

A.    **Background**

Perez's and, to a certain extent, defendant's testimonies at trial differed from Cavazos's testimony concerning what they told him the night of the incident. Defense counsel cross-examined Cavazos in part concerning his report, and whether it was complete and accurate. In addition, defendant disputed, during direct examination, the photograph of Jones's cell phone, saying the location shown in the picture was about 10 feet away from where the parts of the phone landed when he broke it. Asked by his attorney if everything he had told the jury was the truth, defendant affirmed that it was.

On cross-examination, defendant testified he had seen Cavazos "on the streets," but did not know him personally. Asked by the prosecutor if he knew any reason why Cavazos would want to lie about defendant's case, defendant responded, "Not that I can think of."

After the prosecutor asked some questions about defendant's version of events, the following took place:

> "Q. Now, do you recall giving a statement to Officer Cavazos?
>
> "A. No, sir.
>
> "Q. You don't recall, or you are saying you didn't give him one?
>
> "A. I didn't give him one. I gave Officer Stingley a statement.
>
> "Q. Okay, and so when Officer Cavazos testified under oath yesterday, was he lying about taking a statement from you?
>
> "A. Yes, he was.
>
> "Q. And you already told us that you don't know Officer Cavazos?
>
> "A. I do not know him.

7.

"Q. And you don't know of any reason why he would come in here and lie under oath?

"A. No, sir.

"Q. Did you hear [Jones] say she gave Officer Cavazos a statement? [¶] … [¶]

"A. Yes, sir. [¶] … [¶]

"Q. Okay, did you hear yesterday [Jones] testified that you put her in a choke hold?

"A. Yes, sir. [¶] … [¶]

"Q. Now, is it your testimony here today then, because you have told us everything you said is the truth, is it your testimony that Officer Cavazos yesterday was lying when he said you told him you grabbed her and placed her in a hold?

"[DEFENSE COUNSEL]: Objection, asked and answered.

"THE COURT: Overruled. [¶] … [¶]

"A. I don't think it was too much of a lie, I did make one comment. The comment being he asked me did Ms. Jones -- did you have a head mark and I said, yeah. And he said did you grab Ms. Jones, and I said I grabbed her hand from stopping her from grabbing a knife. I didn't grab her in a choke hold. [¶] … [¶]

"Q. And I am just curious, because when you talked to the officer or officers, whichever one you talked to that night, there is no indication of anything about a knife, this is the first I heard of that.

"A. No, it should have been a statement he should have wrote down, because he asked me a question. I said when I was reaching her from stopping to grab the knife I held her in my hand, I didn't have her in no choke hold.

"Q. I am a little bit confused then. Because when you said he should have wrote it down, and you just pointed to Officer Cavazos?

"A. He came in the house.

"Q. He came in the house, but I thought you said you didn't give a statement.

8.

"A. I didn't give him a full statement. He asked me did I assault [Jones], and I did not assault [Jones], but I was trying to tell him what I did and he walked out.

"Q. Okay, so you attempted to give him a statement?

"A. I attempted to give him a statement.

"Q. And while you were attempting to give him a statement he turned his back?

"A. He took the picture of my head and turned around and walked back out.

"Q. Did you tell him anything about taking the phone from her?

"A. No.

"Q. Was he lying yesterday when he told the jury under oath that you said you had taken the phone from her, that you could have?

"A. Yes, he is lying."

**B.      Analysis**

"'"'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]"' [Citations.]' [Citation.] 'Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court *and* requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. [Citations.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1072.)

Defendant failed to object to the "was he lying" questions on the ground of prosecutorial misconduct he now asserts. The record does not suggest any such objection

would have been futile or that an admonition would have failed to cure any harm. (Cf. *People v. Chatman* (2006) 38 Cal.4th 344, 380 (*Chatman*).) Accordingly, defendant has forfeited the claim on appeal. (*People v. Collins* (2010) 49 Cal.4th 175, 206; *People v. Hawthorne* (2009) 46 Cal.4th 67, 97, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643; *People v. Hinton* (2006) 37 Cal.4th 839, 869.) In any event, his claim fails on the merits.[9]

Defendant primarily relies on a line of federal authority that categorically holds "were they lying" questions constitute misconduct. (E.g., *U.S. v. Harrison* (9th Cir. 2009) 585 F.3d 1155, 1158; *U.S. v. Sanchez* (9th Cir. 1999) 176 F.3d 1214, 1219-1220; *U.S. v. Sullivan* (1st Cir. 1996) 85 F.3d 743, 749-750; *U.S. v. Richter* (2d Cir. 1987) 826 F.2d 206, 208.) "'The courts in these cases explain that these questions infringe on the jury's right to make credibility determinations [citations], or that the questions are misleading because they suggest that the only explanation for the discrepancy between defendant's testimony and the other witness' testimony is that one of them is lying [citations]. Moreover, the questions might be considered misleading or calling for a conclusion in that they suggest that the defendant can know what another witness was thinking.' [Citation.]" (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239.)

In *Chatman*, *supra*, 38 Cal.4th 344, the California Supreme Court declined to adopt this categorical approach.[10] Instead, it first questioned whether the issue was

---

**9** Anticipating we would find forfeiture, defendant contends counsel's failure to object constituted ineffective assistance of counsel. Since, as we explain, "we discern no misconduct on the merits, defendant's ineffective assistance claim fails" (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14), and we do not discuss it further.

**10** The court found cases such as *People v. Melton* (1988) 44 Cal.3d 713, 744, which held that lay opinion about the veracity of another's statements is inadmissible on that issue, not controlling: "[Those] cases involved lay opinion from those who had no personal knowledge of the facts. Such opinions are of little assistance in deciding the credibility of testimony by percipient witnesses who do have personal knowledge. There is a difference between asking a witness whether, in his opinion, another is lying and

properly considered one of misconduct, since, while intentionally eliciting inadmissible testimony constitutes misconduct, merely eliciting evidence does not. (*Id.* at pp. 379-380.) It then rejected authority that concluded "were they lying" questions are always improper, and instead approved the line of cases "that counsels a trial court to consider these questions in context. [Citation.]" (*Id.* at pp. 381-382.) The court explained:

> "If a defendant has no relevant personal knowledge of the events, or of a reason that a witness may be lying or mistaken, he might have no relevant testimony to provide. No witness may give testimony based on conjecture or speculation. [Citation.] Such evidence is irrelevant because it has no tendency in reason to resolve questions in dispute. [Citation.]

> "In challenging a witness's testimony, a party implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed. A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable.

> "The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them....' [Citation.]

> "A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken. When … the defendant knows the other witnesses well, he might know of reasons those witnesses might lie. Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses. There is no reason to categorically exclude all such questions. Were a defendant to testify on direct examination that a witness against him lied, and go on to give reasons for

---

asking that witness whether he knows of a reason why another would be motivated to lie." (*Chatman*, *supra*, 38 Cal.4th at p. 381.)

11.

this deception, surely that testimony would not be excluded merely because credibility determinations fall squarely within the jury's province. Similarly, cross-examination along this line should not be categorically prohibited." (*Chatman*, *supra*, 38 Cal.4th at p. 382.)

The court concluded: "In sum, courts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Chatman*, *supra*, 38 Cal.4th at p. 384.)

In the present case, the prosecutor clearly asked the initial question, about whether defendant recalled giving a statement to Cavazos, in preparation for attempting to impeach defendant's testimony or elicit a prior inconsistent statement. This was a permissible purpose. None of the questions appear to be designed to elicit irrelevant or speculative testimony, nor were they argumentative.[11] Although defendant did not know Cavazos personally, defendant testified as a percipient witness and had personal knowledge of the events. (See *Chatman*, *supra*, 38 Cal.4th at p. 382.) By choosing to testify, defendant put his own veracity in issue. Because his testimony contradicted that of Cavazos, it was permissible for the prosecutor to seek to clarify defendant's position and give him the opportunity to explain the divergent testimony. Under the circumstances — including the fact the prosecutor's questions elicited additional information from defendant — the questions "appropriately assisted the jury in resolving the issue of whose testimony was more credible. There was no misconduct." (*People v. Collins, supra,* 49 Cal.4th at p. 206; accord, *People v. Hawthorne, supra,* 46 Cal.4th at

---

[11] "'An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony.'" (*People v. Williams* (2013) 56 Cal.4th 165, 192.)

pp. 96-98; *People v. Tafoya* (2007) 42 Cal.4th 147, 177-179; *Chatman*, *supra*, 38 Cal.4th at p. 383.)

## II

### INSTRUCTIONAL ERROR

Defendant contends that, in light of the prosecutor's argument to the jury, the jury could have convicted him of witness intimidation based either on the act of breaking Jones's cell phone or on the act of writing her a letter after his arrest. This being the case, he argues, the conviction on count 4 must be reversed because the trial court failed to give a unanimity instruction as to that count. The Attorney General says no such instruction was required because the prosecutor elected among the crimes committed. We conclude any error was harmless.

### A.    Background

The evidence was undisputed that defendant broke Jones's cell phone. The prosecution claimed he did it to prevent Jones from calling the police; the defense claimed he did it so Jones could not have Gonzalez give her a tattoo.

During his cross-examination of defendant, the prosecutor sought to elicit testimony about the letter defendant wrote to Jones, after his arrest, in which he referenced Code of Civil Procedure section 1219, subdivision (b). After argument and a foundational hearing in which the prosecutor established (through defendant's admission) that defendant wrote the letter, the trial court ruled the letter was admissible for the purpose of showing an intent to dissuade the witness, Jones. Defendant subsequently was cross-examined on the letter in the jury's presence, and the letter was admitted into evidence.

During his opening argument, the prosecutor told the jurors, in pertinent part:

> "The defendant is charged in Count 4 with intimidating a witness, in violation of Penal Code Section 136.1. To prove the defendant is guilty of this crime, the People must prove that:

13.

"One, the defendant tried to prevent or discourage Jolene Jones from making a report.

"She was the victim of a crime to a peace officer. Where does that come in? Jolene Jones told you, when she was in the kitchen after becoming involved in this argument, she told the defendant she got her cellphone out I should say to make a call, and as she tries to make this call. She told you his response. 'You're not going to call the cops. I almost lost everything the last time.' That is when he grabbed the phone out of her hands. Did he prevent or discourage her? Obviously he prevented her, because what did he do then? He took the phone and he broke it, threw it on the ground, it was in three pieces, okay. That is enough to discourage or prevent someone from making a report."

After discussing count 5 (robbery), the prosecutor turned to the letter. He discussed defendant's explanation for why he wrote it, and his claim he did not know what Code of Civil Procedure section 1219, subdivision (b) said and was simply told by someone to include it. The prosecutor told the jury: "Out of all the sections in California, what are the astronomical odds that he would include that one [which talks about whether a victim of domestic violence can be put in jail for refusing to testify] in his letter to her. Is he trying to assert control? Is he trying to keep her from coming to court and testifying? *Is he trying to dissuade a witness*? Oh, you bet he is. He is still trying to exert control." (Italics added.)

In his argument, defense counsel focused on the breaking of Jones's cell phone as the basis for count 4. He did not mention the letter. In his closing argument, the prosecutor also only addressed the breaking of the cell phone with respect to count 4 and likewise did not talk about the letter.

Neither party requested, and the trial court did not give, a unanimity instruction such as CALCRIM No. 3500.[12]

---

[12] CALCRIM No. 3500 reads: "The defendant is charged with ___ *<insert description of alleged offense>* [in Count ___ ] [sometime during the period of ___ to ___ ]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all

**B.      Analysis**

Section 136.1, subdivision (a) makes it a crime to knowingly and maliciously prevent, dissuade, or attempt to prevent or dissuade a victim from attending or giving testimony at any trial or proceeding.  Subdivision (b)(1) of the statute makes it a crime to attempt to prevent or dissuade a victim of a crime from reporting that victimization to a law enforcement officer.  In each instance, the offense is a "wobbler," punishable by imprisonment in a county jail for not more than one year or in the state prison.  If the act is done knowingly and maliciously, and "is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person," however, the offense is a straight felony punishable by imprisonment in state prison for two, three, or four years.  (*Id.*, subd. (c)(1).)

"In a criminal case, a jury verdict must be unanimous.  [Citations.]  … Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]"  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  Accordingly, cases have long held that "when the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed … that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.  [Citations.]"  (*People v. Gordon* (1985) 165 Cal.App.3d 839, 853, fns. omitted, disapproved on other grounds in *People v. Frazer* (1999) 21 Cal.4th 737, 765 & *People v. Lopez* (1998) 19 Cal.4th 282, 292; accord, *People v. Russo*, *supra*, at p. 1132.)

---

agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

"The unanimity requirement is constitutionally rooted in the principle that a criminal defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged.  [Citations.]"  (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1499-1500.)  It "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed'" (*People v. Russo, supra,* 25 Cal.4th at p. 1132) as when, for example, the jury "'amalgamat[es] evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]"  (*People v. Moore* (1989) 211 Cal.App.3d 1400, 1415.)

A trial court has a sua sponte duty to instruct on unanimity when the circumstances warrant and no election has been made.  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)  A trial court's failure to so instruct is subject to our de novo review.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

In the present case, either the breaking of Jones's cell phone or the letter defendant wrote her could have constituted a violation of section 136.1, and the Attorney General does not claim otherwise.  She contends, however, that no unanimity instruction was required, because the prosecutor elected, during his summation to the jury, to rely on the cell phone incident as the basis for count 4.

Although the prosecutor undoubtedly emphasized the breaking of Jones's cell phone, his argument with respect to the letter "muddied the waters," and he did not then clearly or directly inform jurors of his election and their concomitant duties.  (Compare *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292 with *People v. Melhado, supra,* 60 Cal.App.4th at p. 1536.)  We need not decide whether the prosecutor's emphasis on the cell phone incident obviated the need for a unanimity instruction, however, because any error in the failure to give such an instruction was harmless under either the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24) or *Watson* (*People v. Watson* (1956) 46

16.

Cal.2d 818, 836) standard of prejudice. (See *People v. Huggins* (2006) 38 Cal.4th 175, 193.)[13]

In the present case, jurors were instructed that before they could complete and sign a verdict form for "guilty" of a charged crime, they all had to agree the People had proved guilt beyond a reasonable doubt. Specifically as to count 4, they were told the People had to prove, in pertinent part, defendant "tried to prevent or discourage Jolene Jones *from making a report* that she was a victim of a crime *to a peace officer*." (Italics added.) There is no reasonable likelihood jurors interpreted this requirement as encompassing the letter but not the cell phone incident. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 831; cf. *People v. Moore* (1983) 143 Cal.App.3d 1059, 1064-1065.)

Moreover, even if such a strained reading were possible, jurors were further instructed as to count 4 that if they found defendant guilty of intimidating a witness, they then had to decide whether the People proved defendant acted maliciously and "*used force or threatened either directly or indirectly to use force or violence* on the person or the property of the victim." (Italics added.)[14] Jurors expressly found this allegation to be

---

[13] There has long been a split in authority concerning the standard applicable to the erroneous failure to give a unanimity instruction. (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1448-1449.) We have previously held the *Chapman* standard applicable to federal constitutional error applies. (*People v. Gary* (1987) 189 Cal.App.3d 1212, 1218, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 481; *People v. Metheney* (1984) 154 Cal.App.3d 555, 563-564, fn. 5.)

[14] The written instruction that was given to the jury for use in deliberations, and the instruction as orally read by the trial court, stated jurors had to decide whether the People proved "that the defendant acted maliciously *or* used or threatened to use force" (italics added), but then immediately stated to prove the allegation, the People had to prove the defendant acted maliciously *and* used or threatened to use force. In the written instruction, "and" was capitalized for emphasis. Section 136.1, subdivision (c)(1) requires proof of maliciousness *and* use or threatened use of force, and the verdict also stated the requirements in the conjunctive. Under the circumstances, there is no reasonable likelihood jurors understood only maliciousness *or* force to be required.

17.

true. Nothing in the letter constitutes a threat — whether direct or indirect — to use force or violence.[15]

"We of course presume 'that jurors understand and follow the court's instructions.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Under the evidence presented at trial, jurors could not have found the special finding appended to count 4 to be true based on the letter. Accordingly, since "'[a] unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged'" (*People v. Beardslee* (1991) 53 Cal.3d 68, 93), either no unanimity instruction was required as to count 4 or its omission, if error, was harmless beyond a reasonable doubt.

## III

### SENTENCING ISSUES

**A.    Multiple Convictions**

As previously described, defendant was convicted, in count 1, of simple assault as a lesser included offense of assault by means of force likely to produce great bodily injury and, in count 2, of simple battery as a lesser included offense of willful infliction of corporal injury resulting in a traumatic condition. Defendant was sentenced on both counts (albeit with credit for time served), and ordered to pay a court operations assessment (§ 1465.8) in the amount of $40 and a court facilities funding assessment (Gov. Code, § 70373) in the amount of $30 as to each.

The charges in counts 1 and 2 were based on the same conduct, and assault is a lesser included offense of battery. As a result, defendant contends, and the Attorney General concedes, the conviction on count 1 must be reversed, and the attendant monetary assessments eliminated. We agree.

---

[15]    We have read the letter, which is contained in the clerk's transcript on appeal and which was sent in to the jury as an exhibit at the beginning of deliberations.

18.

"In this state, multiple convictions may not be based on necessarily included offenses arising out of a single act or course of conduct.  [Citations.]"  (*People v. Lewis* (2008) 43 Cal.4th 415, 518, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920; accord, *People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227.)  "'An assault is a necessary element of battery, and it is impossible to commit battery without assaulting the victim.'  [Citation.]"  (*People v. Colantuono* (1994) 7 Cal.4th 206, 216-217.)  Under the circumstances of the present case, defendant could not properly be convicted of both assault and battery on Jones.  (*People v. Ortega* (1998) 19 Cal.4th 686, 692, overruled on another ground in *People v. Reed, supra,* 38 Cal.4th at pp. 1228-1229, 1231; *People v. Lopez* (1975) 47 Cal.App.3d 8, 15.)  The assault conviction must be reversed.

Assessments imposed pursuant to section 1465.8, subdivision (a)(1) and Government Code section 70373, subdivision (a)(1) apply to each conviction, i.e., each count of which a defendant is convicted.  (E.g., *People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484; *People v. Calles* (2012) 209 Cal.App.4th 1200, 1226; *People v. Cortez* (2010) 189 Cal.App.4th 1436, 1439, 1442-1443; *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1328; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1372.)  The trial court here imposed an aggregate assessment of $160 pursuant to section 1465.8 ($40 times four counts) and an aggregate assessment of $120 pursuant to Government Code section 70373 ($30 times four counts).  We modify the judgment to provide for an aggregate assessment of $120 pursuant to section 1465.8 and $90 pursuant to Government Code section 70373.

**B.    Section 654**

Defendant's final claim is that the punishment imposed on count 2 (credit for time served) should have been stayed pursuant to section 654, because the battery of which he

was convicted in count 2 was incidental to the false imprisonment for which he was convicted and sentenced in count 3.[16] The Attorney General says separate punishment was permissible, because the convictions were based on multiple, independent objectives. She says the original act of choking Jones was intended to harm her because she allowed guests into the apartment; then, as events unfolded, defendant's intent or objective changed, and he attempted to drag Jones to the bedroom, thereby preventing her from contacting police or leaving the apartment.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The purpose behind this provision is to ensure that punishment will be commensurate with culpability. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 367-368.)

"Section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)" (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.) "Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) If, however,

---

**16** Defendant did not object to the imposition of separate sentences in the trial court. However, an objection is not required to preserve a section 654 claim for review on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.)

"all of the crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment. [Citation.]" (*People v. Islas, supra,* 210 Cal.App.4th at p. 129.)

Whether a defendant harbored a separate intent and objective for each offense is a factual determination for the trial court. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) When a trial court sentences a defendant to separate terms without making an express finding the defendant acted pursuant to separate objectives, that court is deemed to have made an implied finding that each offense had a separate objective (*People v. Islas, supra,* 210 Cal.App.4th at p. 129), and that conclusion will be sustained on appeal if supported by any substantial evidence (*People v. Osband*, *supra*, at p. 730). On review of this issue, we consider the evidence in the light most favorable to the judgment. (*People v. Williamson* (1979) 90 Cal.App.3d 164, 172.) If we determine the trial court violated section 654, the proper remedy is to stay execution of sentence on the count with the lesser penalty. (*People v. Beamon* (1973) 8 Cal.3d 625, 639-640.)

"Section 654 prohibits multiple punishment for a *single physical act* that violates different provisions of law." (*People v. Jones* (2012) 54 Cal.4th 350, 358, italics added.) The question is whether defendant's grabbing Jones around the neck and dragging her constituted a single physical act. In the course of discussing count 2, the prosecutor told jurors: "The act of choking Jolene Jones could account for more than one crime.… In this particular case the choking could result in multiple charges like we have in this case, okay." The prosecutor then observed that the first element the People had to prove with respect to count 3 was that defendant intentionally restrained or detained someone by violence or menace. The prosecutor argued: "Ladies and gentlemen, if you take somebody by the neck and grab them they didn't go willingly, you detained them. They didn't go willingly, it was by violence. And the defendant made the other person stay or go somewhere against the person's will. How do we know in this case that Jolene Jones did not go willingly with the defendant while he had her by the neck and was dragging

21.

her throughout the apartment?  It is quite simple.  What did she tell you, and what did the defendant tell you?  Because when he had her and was taking her around the apartment she was trying to get free, and with her hand she grabbed an object which turned out to be a free standing mirror, and she whacked him in the head.  There is the proof of it.  She was trying to get away.  She was not going willingly."

The prosecutor argued the existence of a single physical act — choking Jones — as the basis of multiple convictions.  Under the circumstances, execution of sentence on count 2 should have been stayed.  (See, e.g., *People v. McKinzie* (2012) 54 Cal.4th 1302, 1368-1369; *People v. Jones, supra,* 54 Cal.4th at p. 359.)  We modify the judgment to so provide.

## DISPOSITION

The conviction on count 1 is reversed.  The judgment is modified to (1) stay execution of sentence on count 2 pending completion of sentence on count 3, such stay then to become permanent; (2) provide for imposition of an aggregate assessment of $120 pursuant to Penal Code section 1465.8; and (3) provide for imposition of an aggregate assessment of $90 pursuant to Government Code section 70373.  As so modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting these changes and to forward a certified copy thereof to the appropriate authorities.

_____
DETJEN, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.

22.