Filed 11/20/14 P. v. Ward CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064330 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE320627) |
| TROY D. WARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge. Affirmed as modified.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Troy Ward of one count of first degree burglary (Pen. Code § 459,[1] count one), two counts of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) involving the victims Ms. Buganan (count three) and Mr. Williams (count four), one count of corporal injury to a former cohabitant or spouse (§ 273.5, subd. (a), count two), and vandalism under $400 (§ 594, subds. (a) & (b)(2)(A), count five).  In a bifurcated proceeding, the court found true the special allegations that Ward had a prior conviction within the meaning of former Penal Code section 273.5, subdivision (e)(1), suffered two prior strike convictions (§§ 667, subds. (b)-(i) & 1170.12), served three prior prison terms (§§ 667.5, subd. (b)), and had two prior serious felony convictions (§§ 667, subd. (a)(1)).

The court denied Ward's motion to dismiss one or more of his prior strike conviction allegations, and sentenced him to a term of 35 years to life.  Ward contends: (1) the evidence is insufficient to support his convictions for assault; (2) the absence of evidentiary support for the assault convictions undermines the burglary conviction; (3) the court abused its discretion by admitting evidence of his prior conviction for assaulting Buganan; (4) the court abused its discretion by denying his request to have Buganan's ex-boyfriend testify; (5) the court's denial of his motion to dismiss a prior strike conviction allegation under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) was an abuse of discretion; (6) the court erred when it sentenced him to concurrent terms on

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

2

counts two and four and instead should have stayed the sentences on those counts under section 654; and (7) the court miscalculated his custody credits.

I

FACTS

A. <u>Relationship Between Buganan and Ward</u>

Buganan and Ward were involved in a dating relationship starting in 2009. The relationship was tumultuous, and they broke up but resumed dating over the years. During one period of separation in 2010, Ward was sentenced to state prison and served time after he was convicted of committing domestic violence against Buganan, who continued to visit Ward while he was incarcerated, however, because she hoped they could work out their problems and resume a romantic relationship. When Ward was released from prison in the fall of 2011, Buganan picked him up from the prison and took him to her house and was intimate with him that night. They resumed their dating relationship during the next nine months, and he moved into Buganan's mobile home in the spring of 2012.

B. <u>The Charged Offenses</u>

About one month after Ward moved into Buganan's home, she ended their relationship and told him to take his possessions and move out. She told Ward she would put his possessions on the back porch for him to pick up and Ward said he would return to retrieve them. She put his possessions on the porch and, after about one week, he retrieved them. Buganan told Ward not to come to her house any more. However, Ward

3

continued to come to her home. Buganan believed he entered the mobile home when she was not there, and also believed he was responsible for using an external water lever to turn off the water to the mobile home on several occasions.

Buganan began a romantic relationship with Williams around the time she told Ward to move out in 2011. On a couple of occasions, she dropped Williams off so he could go inside her mobile home while she parked her car, and Ward approached Buganan and told her to have "that punk" (referring to Williams) come outside. On the evening of May 3, 2012, Buganan and Williams were at the mobile home when Buganan realized the water to the mobile home had again been shut off, and she suspected Ward was responsible. She went to a sliding glass door in the bedroom, carrying a small flashlight, to look outside for Ward. Buganan put her eye up to the window to look out and Ward, standing just outside the door holding a hammer, immediately struck the door and the glass shattered. Glass flew into Buganan's eye and Ward immediately entered.

Buganan tried to escape from the bedroom into the hallway but Ward stopped her by grabbing her and shoving her into the corner of the room with such force that it caused bruising to (and scratches on) her chest. He then put both hands around her neck to choke her.

Williams, who heard the glass shatter and Buganan scream, rushed into the bedroom. He saw Ward holding Buganan by the neck against the wall. Ward released Buganan and turned on Williams who, realizing Ward was about to turn on him, told

4

Buganan to leave. Ward grabbed Williams and the two men began wrestling while Buganan ran outside to summon help.

Williams testified the two men began wrestling and Ward lifted Williams completely off his feet and threw him through the shattered glass door. Williams landed outside and jumped to avoid landing on an electrical box but ended up landing on his head and neck area. He got up as Ward pursued him through the door. Ward punched him several times in the face and chest as he tried to fight back. The men grappled and crashed through a neighbor's fence, knocking it down. They both got up, continuing to wrestle and throw punches, and Ward threw Williams against a shed. The fight continued and they ended on Buganan's car, with Ward on top. However, Williams continued to fight back and Ward started to flee. Williams caught and tried to hold him until the sheriff arrived, but Ward was able to pull away from Williams and run off. The fight lasted between five and 10 minutes.

A deputy sheriff responding to the scene found Buganan screaming and crying uncontrollably. The deputy also saw Williams, who was naked, had sustained a cut near his left eye around the temple area. He also suffered a cut to his leg caused by the glass when he was fighting Ward on the ground, a "big cut" to his thigh, and cuts on his head, back and left side of his eye. Approximately one week later, Ward was found near the mobile home park and arrested.

C. Ward's Prior Domestic Violence Against Buganan

During one of their periods of separation, Ward borrowed Buganan's car to go to a medical appointment. When Buganan could not locate Ward at the place of the appointment, she (accompanied by her friends Sherri and Elizabeth Rodriguez) went to Ward's workplace to get her car. Ward opened the gate to allow Buganan and Elizabeth onto the property while Sherri remained in Buganan's truck. However, Ward was apparently angry at Buganan and, after Elizabeth went back out the gate, Ward closed the gate with Buganan still inside, and began assaulting her. He struck her and knocked her down several times, and threatened to kill her. Sheri and Elizabeth demanded Ward stop and he let Buganan go, and she started walking back to her truck. However, he followed her and continued to grab her and knock her down. When she reached the truck, he grabbed the chain around her neck as though he was going to choke her. He then stopped the assault and walked back inside the gate.

Buganan walked down the gravel road to locate Elizabeth, who had gone to find help. Buganan heard Sherri yell, "Run. He's coming down with the car," and they saw Ward driving toward Buganan "pretty fast." Buganan, fearing Ward would hit her with the car, first tried to seek shelter in a passerby's vehicle but, when the passerby drove off, she ran behind a tree and then behind a fence of another residential property. Ward drove toward her at the fence, coming within a few feet or inches. Buganan obtained assistance by calling an ambulance from a nearby house, and was treated at the hospital for her injuries for several hours.

6

When she testified at his criminal proceedings for the 2010 assault, she was not completely honest because she thought they could work out their relationship, and because she was scared he might hurt her when he was released from prison. Similar reasons led her to discount Ward's actions when she spoke with personnel at the district attorney's office in connection with the original 2010 case.

D. Defense

Ward testified on his own behalf. At Buganan's invitation, he went to her mobile home on May 3 to collect his belongings. Buganan invited him inside and told him his property was in the master bedroom but, when he went to the bedroom, she tried to touch and hug him. He resisted her advances but he then heard the front door open and Williams came inside the mobile home, entered the bedroom, and assaulted Ward. They wrestled and crashed through the glass door and, after a few minutes of fighting, Ward left because he was violating his parole by being at Buganan's home.

II

ANALYSIS

A. Substantial Evidence Supports the Convictions on Counts Three and Four

Ward argues the evidence was insufficient to support the convictions for assault by means of force likely to produce great bodily injury, within the meaning of section 245, subdivision (a)(4), because a rational jury could not have found from the evidence that the force he applied in his assaults on Buganan and Williams was likely to produce great bodily injury.

7

*Legal Principles*

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314; accord, *People v. Clark* (2011) 52 Cal.4th 856, 943 [substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence, and the court must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence].)

In *People v. McDaniel* (2008) 159 Cal.App.4th 736, the court explained section 245, subdivision (a)(4), prohibits " 'an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury. While . . . the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.' [Quoting *People v. Muir* (1966) 244 Cal.App.2d 598, 604.] Great bodily

8

injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate. [Citation.] ' " [']The crime . . . , like other assaults, may be committed without infliction of any physical injury, and even though no blow is actually struck. [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it.['] " ' [Quoting *People v. Duke* (1985) 174 Cal.App.3d 296, 302, italics omitted by *McDaniel*.] The focus is on the force actually exerted by the defendant, not the amount of force that could have been used." (*People v. McDaniel, supra,* 159 Cal.App.4th at p. 748.)

"That the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury' is well established[.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) "Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied." (*People v. McDaniel, supra,* 159 Cal.App.4th at pp. 748-749.)

*Count Four: The Assault on Williams*

Ward argues there was no evidence he assaulted Williams with force likely to cause great bodily injury because he only threw Williams through a glass door, the glass of which was already broken, and then grappled with and punched Williams, who sustained only minor injuries. However, the jury was entitled to consider that Ward was

9

apparently much larger than Williams[2] and was able to lift him completely off his feet when he threw him through the shattered glass door, and that Williams landed on his head and neck area in an area littered with broken glass, and only fortuitously avoided substantial injury by twisting to avoid landing on an electrical box. This evidence would permit a jury to infer that, although Williams in fact avoided more significant injury, Ward did apply force *likely* to cause great bodily injury. Moreover, a jury was entitled to consider that Ward, with his considerable size advantage, punched Williams several times in the face and chest and threw him against a shed, and that the fight was so fierce they crashed through and knocked down a neighbor's fence. A rational trier of fact could conclude that, although Williams's injuries were not more significant, Ward nevertheless did apply force *likely* to cause great bodily injury.

*Count Three: The Assault on Buganan*

Ward asserts there is no evidence from which a jury could have concluded he assaulted Buganan with force likely to cause great bodily injury. However, there was some evidence from which the jury could have inferred Ward "knew . . . that he used an amount of force a reasonable person would realize was likely to result in great bodily injury" (*People v. Wyatt* (2010) 48 Cal.4th 776, 779), or that he "act[ed] with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act." (*Id*. at p. 781.) Buganan testified

---

[2] The jury saw both men at trial and, although the reporter's transcript is not explicit as to their height and weight, the transcript of the 911 call from Buganan included her descriptions of Ward and Williams suggesting Ward was five inches taller and 90 pounds heavier than Williams.

10

she went to a sliding glass door in the bedroom carrying a small flashlight to look outside for Ward and, when she put her eye up to the window to look out, Ward used his hammer to strike the door and shatter the glass adjacent to her eye, and that glass flew into her eye. A reasonable jury could have inferred, from the fact that it was dark outside where Ward stood but illuminated inside when Buganan placed her face against the glass door to peer out, that Ward was within arm's length of the window and would have seen Buganan approach and place her eye next to the window but Ward nevertheless swung the hammer to shatter the glass into her face. A reasonable jury could infer Ward thus used an amount of force "a reasonable person would realize was likely to result in great bodily injury" (*Id.* at p. 779) or, at a minimum, acted "with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act." (*Id*. at p. 781.)

Although the foregoing evidence would suffice to support the conviction, there was also evidence Ward thereafter continued his assault on Buganan and employed force likely to result in great bodily injury: Ward shoved her with such force that it caused bruising to (and scratches on) her chest and put both hands around her neck to choke her. A rational jury could conclude that commencing to cut off Buganan's air supply was an application of force likely to cause great bodily injury, and would have in fact caused great bodily injury but for the fortuity that Williams interrupted Ward's attack on Buganan.

B. <u>Substantial Evidence Supports the Burglary Conviction</u>

Ward argues on appeal that, because the evidence was insufficient to support the *convictions* on counts three and four, his conviction for burglary cannot stand because it is impossible to determine whether the jury relied on the legally infirm theory that Ward entered to commit the felony of assault likely to cause great bodily injury or on the legally supported theory that Ward entered to commit the felony of corporal injury to a former cohabitant or spouse with a prior offense. Our rejection of Ward's contentions as to the factual sufficiency of the evidence to support the assault convictions is fatal to his arguments on the burglary count.

More importantly, the burglary conviction would be upheld as long as there was evidence from which the jury could have inferred Ward entered with the *intent* of committing an assault likely to cause great bodily injury, even if he did not *actually* commit those crimes. (See, e.g., *People v. Novo* (1936) 12 Cal.App.2d 525, 528 ["If he actually entered the house with the intention of committing the felony with which he was charged he is guilty of burglary even though he abandoned that unlawful purpose one moment after his entry and in spite of his failure to accomplish his object"]; *People v. Clifton* (1957) 148 Cal.App.2d 276, 279 [Where facts permit "a reasonable inference that appellant entered her apartment with the intent to assault the lady with force likely to produce great bodily injury[,] . . . [t]he fact that he did not assault her is immaterial. His crime was complete the moment he entered her home with intent either to steal her possessions or to do her bodily harm."].) Ward makes no claim that the evidence was

12

insufficient for a rational jury to infer he possessed the requisite intent when he entered, and this provides an independent ground for affirming his burglary conviction.

C. Excluding Ward's Proffered Third Party Testimony Was Not an Abuse of Discretion

Ward contends the court abused its discretion when it denied his effort to introduce the testimony of Mr. Legaux, a former boyfriend of Buganan, and this error denied him the opportunity to present an effective defense. Ward's offer of proof was that Mr. Legaux would have testified Buganan was possessive, threatened to have him arrested when they had a disagreement, and had called the police to their home numerous times claiming there was a man at her home who would not leave. However, Legaux was never arrested because, when police arrived and asked Buganan if Legaux had hit her or touched her, Buganan would invariably say "no." Legaux would also have testified he had left his possessions at her home, she refused to return the possessions to him and told him the only way to get them was for Legaux to return to her. The People opposed the introduction of this evidence and, when the court asked what relevance it had, Ward argued the evidence was admissible to prove Buganan's intent and modus operandi of threatening ex-boyfriends with police action unless they did what she wanted. The court excluded the evidence under Evidence Code section 352 because it had minimal relevance, would have required an undue consumption of time, and also would have had the tendency to mislead and confuse the jury.

Ward argues on appeal the evidence was relevant and admissible as a prior false report under Evidence Code section 1103 to impeach Buganan's credibility. Evidence Code section 1103, subdivision (a)(1), states, in part, that evidence of a crime victim's character in the form of "specific instances of conduct" is not inadmissible under section 1101 of the same code where the defendant seeks to prove "conduct of the victim in conformity" with such evidence in a criminal case. Thus, a prior false accusation of rape is admissible on a rape victim's credibility (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 600), and a prior false accusation of sexual molestation is relevant on the issue of the molest victim's credibility. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.) However, that evidence is subject to exclusion under Evidence Code section 352 if the probative value of the evidence is substantially outweighed by the probability that its admission would require the undue consumption of time, confuse the issues or mislead the jury. (*People v. Stitely* (2005) 35 Cal.4th 514, 547 & fn. 15; *People v. Tidwell, supra*.) A court's determination to exclude evidence under section 352 will not be reversed absent an abuse of discretion. (*People v. Basuta* (2001) 94 Cal.App.4th 370, 386.)

We conclude the exclusion of the evidence here was not an abuse of discretion. The issue here was whether Buganan (as well as Williams) truthfully described Ward's assaultive conduct. The only potential relevant "prior false report" evidence would be evidence that Buganan would exact retribution against a former boyfriend by calling police and then falsely accusing the boyfriend of assaultive behavior to have him arrested

14

and prosecuted for crimes he had not committed. Legaux's testimony, although it would have established Buganan called the police to their home numerous times, would have shown the opposite because Legaux would have testified that on every occasion Buganan did *not falsely accuse him of assaultive behavior* to have him arrested but instead *truthfully told police* that Legaux had *not* hit her or touched her. We do not conclude the exclusion of such evidence was an abuse of the trial court's discretion, or that it denied Ward his right to present a defense.

D. The Court Did Not Abuse Its Discretion by Admitting Evidence Surrounding Ward's Prior Conviction for Assaulting Buganan

Ward contends the court abused its discretion when it overruled his objection under Evidence Code section 352 to admitting the underlying facts surrounding his 2010 assault conviction. He argues Buganan's testimony had minimal probative value because of its internal inconsistencies, it was unduly prejudicial, it required an undue consumption of time and was likely to confuse the issues.

"Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109)." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) Section 1109 represents a policy determination by the California Legislature that considerations favoring the exclusion of evidence of uncharged domestic violence offenses "are outweighed in criminal domestic violence cases by the policy

15

considerations favoring the admission of such evidence" (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420), and in effect permits admission of evidence of a defendant's other acts of domestic violence for the purpose of showing his propensity to commit such crimes. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.) Although such evidence can be admitted under section 1109, it is subject to exclusion under section 352, and the court's ruling under section 352 is reviewed for abuse of discretion. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.)

Ward argues Buganan's testimony concerning the incident lacked any probative value because (1) Buganan told personnel at the district attorney's office (in connection with the original 2010 case) Ward had not driven a car at her or assaulted her, and he was not guilty of the charges; (2) she provided false testimony at his preliminary hearing; and (3) a third person told a defense investigator that Buganan said Ward was not guilty of the 2010 assault. However, Buganan proffered reasons for why she made statements in 2010 minimizing Ward's culpability, and it was for the jury to determine whether these reasons credibly explained why her current version of the events differed from her 2010 statements. The fact a jury must determine a witness's credibility does not mean the witness's testimony lacks probative value ab initio.

Ward also argues, even if there was some probative value to the evidence, the risk of undue prejudice and undue consumption of time was so high that it clearly outweighed the probative value of the evidence, and therefore it was an abuse of discretion to admit the evidence. However, propensity evidence under section 1109, particularly when it

16

involves the same victim, is "highly relevant and probative of the issues in this case" (*People v. Hoover, supra,* 77 Cal.App.4th at p. 1029), and the jury's knowledge that Ward was punished for this earlier assault "substantially mitigates the kind of prejudice usually associated with the introduction of prior bad act evidence." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.) Although admission of the evidence did involve an additional consumption of time, we conclude it was not an abuse of discretion for the court to conclude the probative value of the evidence warranted the additional time necessary to present the evidence.

E. The *Romero* Claim

Ward contends the court abused its discretion when it rejected his motion to dismiss one or more of his prior strike conviction allegations under *Romero, supra,* 13 Cal.4th 497.

*Discretion to Dismiss*

A trial judge may dismiss a prior strike conviction allegation in the furtherance of justice under section 1385. (*Romero, supra*, 13 Cal.4th 497.) In doing so, trial courts are bound to follow the general principles regarding the exercise of discretion developed in the law under section 1385. When evaluating whether to dismiss prior strike conviction allegations, a court must consider both the interests of the defendant as well as those of the public as represented by the prosecutor. (*People v. Orin* (1975) 13 Cal.3d 937, 945.) Judges making such decisions should be influenced by those factors that would convince

a reasonable trial judge to reach the same conclusion. (*Ibid.; People v. Williams* (1998) 17 Cal.4th 148, 159.)

*People v. Carmony* (2004) 33 Cal.4th 367 (*Carmony*) determined a trial court's decision not to dismiss a prior strike conviction allegation under section 1385 is reviewed under "the deferential abuse of discretion standard." (*Carmony,* at p. 371.) *Carmony* explained that when reviewing a decision under that standard, an appellate court is guided

> "by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at pp. 376-377.)

The court in *Carmony* stressed that in determining whether a trial court acted "irrationally or arbitrarily in refusing to strike a prior conviction allegation," the reviewing court must consider the refusal in the context of the legal principles and policies regarding the particular law under which the discretionary exercise of authority was sought. (*Carmony, supra,* 33 Cal.4th at p. 377.) In *Carmony*, as here, the three strikes law (§ 667, subds. (b)-(i)) was the pertinent law for this inquiry. (*Carmony,* at p. 377.)

In reviewing the three strikes law, *Carmony* reiterated its observation made in *Romero* that the law was " 'intended to restrict courts' discretion in sentencing repeat offenders.' "  (*Carmony, supra*, 33 Cal.4th at p. 377.)  *Carmony* also repeated its requirement set out in *Williams* that a trial court " 'must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies . . .' [citation]" before exercising its discretion to dismiss a prior strike allegation.  (*Carmony,* at p. 377.)

The court in *Carmony* further explained that because a trial court's adherence to the provisions of the three strikes law creates a strong presumption the trial court was not abusing its discretion in refusing to dismiss a prior strike conviction allegation for purposes of sentencing under that scheme, "a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances[, such as] where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation,] [or where] 'the sentencing norms [established by the three strikes law may, as a matter of law, produce] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case."  (*Carmony, supra*, 33 Cal.4th at p. 378.)

*Evaluation*

Ward has not clearly shown the sentencing court abused its discretion. The trial court was aware of its discretion to dismiss the prior strike conviction allegation and Ward does not suggest the court considered any impermissible factors in declining to do so. The probation report and argument from counsel fully informed the court of Ward's criminal history and current offense, and the trial court was aware of its discretion to dismiss and did not consider any impermissible factors in declining to dismiss. The record showed Ward had served many years in prison (and violated parole multiple times), been incarcerated most of the time since 1997, twice attacked women after being released from prison even before the instant offense, and again attacked Buganan less than a year after being released from prison, all of which provided support for the conclusion Ward was not a person outside the spirit of the three strikes law.

Ward asserts the facts of the present crime do not warrant a life sentence because they did not involve great bodily injury, were crimes involving passion, and it was merely fortuitous that it occurred in Buganan's home rather than on the street. Moreover, he argues one of his earlier crimes was of ancient vintage, and the other arose from the same dysfunctional relationship with Buganan as the present offense, which showed he was not a danger to the community.[3] However, our role is not to decide the merits of his motion

---

[3] Ward also appears to complain the court's ruling provided no insight into what animated its ruling. However, a trial court is not required to state reasons for denying a *Romero* motion. Although "a court must explain its reasons for striking a prior [citations], no similar requirement applies when a court declines to strike a prior [citation]. 'The absence of such a requirement merely reflects the legislative presumption

anew, but rather to assess whether the court abused its discretion in balancing "the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects." (*People v. Williams, supra,* 17 Cal.4th at p. 161.) "The concept of discretion implies that, at least in some cases, a decision may properly go either way." (*In re Large, supra,* 41 Cal.4th at p. 553.) The fact Ward may articulate good arguments for dismissing a prior strike conviction allegation in the furtherance of justice does not require reversal. (*Carmony, supra,* 33 Cal.4th at p. 378 [it is not enough to show that reasonable people might disagree about whether to dismiss one or more prior conviction allegations].)

The record reflects the court was fully aware of its discretion to dismiss a prior strike conviction allegation for purposes of sentencing under the three strikes scheme but declined to exercise its section 1385 discretion. We conclude the trial court did not abuse its discretion by denying Ward's *Romero* motion.

F. The Section 654 Claim

Ward contends the court erred when it sentenced him to concurrent terms on counts two and four and instead should have stayed the sentence on counts two and four

---

that a court acts properly whenever it sentences a defendant in accordance with the three strikes law.' [Citation.] 'Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper.' " (*In re Large* (2007) 41 Cal.4th 538, 550.)

21

under section 654.[4]  He asserts that because the burglary on which he was sentenced was based on his entry with the intent to commit the underlying felonies of assaulting Buganan and Williams, his sentence on the burglary necessarily requires punishment on these underlying felonies be stayed under section 654 pursuant to *People v. Hester* (2000) 22 Cal.4th 290, 294 (*Hester*) and *People v. Islas* (2012) 210 Cal.App.4th 116, 130 (*Islas*). Although the People concede the analogous decision in *Islas, supra,* as well as dicta in *Hester, supra,* requires the sentence on count two be stayed under section 654, they contend the unstayed sentence on count four was properly imposed.

*Section 654*

Section 654, subdivision (a), states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Section 654 bars double punishment, including concurrent sentences, for a course of conduct constituting one indivisible transaction with one criminal objective.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*), disapproved in part by *People v. Correa* (2012) 54 Cal.4th 331,

---

[4]    On the principal term, the court sentenced Ward to 25 years to life on the burglary conviction and two 5-year terms, to be served consecutively, for each of the serious prior felony conviction allegations found true.  The court also imposed a term of eight years on the corporal injury to cohabitant conviction (count two), which it ordered to run concurrent to the principal term, and imposed but "given the conviction [on] count two" stayed (pursuant to § 654) a six-year term for the assault count (count three) involving the same victim as involved in count two. The court also imposed a term of six years for the assault conviction involving the victim Williams (count four), which it also ordered to run concurrent to the principal term.

334, 343-344; *People v. Latimer* (1993) 5 Cal.4th 1203; *People v. Lee* (1980) 110 Cal.App.3d 774, 785.)  " 'It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible.  [Citations.] . . . [I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating[,] one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.' "  (*People v. Hicks* (1993) 6 Cal.4th 784, 789, quoting *People v. Harrison* (1989) 48 Cal.3d 321, 335.)  However, when the evidence permits the conclusion the defendant harbored " 'multiple criminal objectives . . . independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' "  (*People v. Akins* (1997) 56 Cal.App.4th 331, 338-339.)

Section 654 does not preclude multiple punishments under certain circumstances. For example, it does not preclude multiple punishments where the defendant's course of conduct, even though directed to one objective, is divisible in time.  (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 [§ 654 does not bar punishment where temporal separation of offenses afford defendant opportunity to reflect and to renew his or her intent before committing next offense].)  More importantly, under the so-called "multiple victims" exception, section 654 does not preclude multiple punishments where "the criminal act—that is, the crime of which defendant was convicted . . .—was *defined* by statute to proscribe an act of violence against the person, that is, as *Neal*, *supra*, 55 Cal.2d

23

at page 20, put it, an act of violence committed 'with the intent to harm' or 'by [a] means likely to cause harm' to a person." (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1089 (*Hall*) italics added by *Hall*, disapproved on other grounds by *People v. Correa, supra,* 54 Cal.4th at pp. 343-344.) *Neal* explained that permitting separate punishments for an act of violence against multiple victims accords with the underlying purpose of section 654's proscription of "insur[ing] that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual.' " (*Neal, supra,* 55 Cal.2d at pp. 20-21, quoting *People v. Brannon* (1924) 70 Cal.App. 225, 235-236.)

On appeal, we view the evidence most favorably to the court's sentencing decision and presume in support of the order the existence of every fact the court could reasonably deduce from the evidence. (*People v. McGuire* (1993) 14 Cal.App.4th 687, 698.) The "trial court's implied finding that a defendant harbored a separate intent and objective for

24

each offense will be upheld . . . if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512; accord, *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466, disapproved on other grounds by *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

*Analysis*

Ward asserts that because the burglary on which he was sentenced was based on his entry with the intent to commit the underlying felonies of assaulting Buganan and Williams, his sentence on the burglary necessarily requires that punishment on these underlying felonies be stayed under section 654 pursuant to *Islas, supra,* 210 Cal.App.4th 116, and *Hester, supra*, 22 Cal.4th 290. In *Islas*, the defendant was convicted of five counts of false imprisonment as well as one count of burglary, and the burglary conviction was premised on the defendant's entry into the apartment with the intent of committing the underlying felonies of false imprisonment. (*Islas,* at p. 129.) The *Islas* court (citing numerous cases including the dicta in *Hester*) concluded the sentences on the false imprisonment counts were required to be stayed under section 654, explaining that "the burglary conviction was based entirely on entry with the intent to commit felony false imprisonment. When a defendant is convicted of burglary and the intended felony underlying the burglary, section 654 prohibits punishment for both crimes. [Citations.] Because the felony underlying the burglary conviction was felony false imprisonment, the trial court should have stayed the terms imposed for felony false imprisonment." (*Id*. at p. 130.) Ward asserts, and the People concede, that because Ward's burglary

25

conviction was based on his intent to commit the underlying felonious assault on Buganan, *Islas* requires the sentence on count two be stayed under section 654.

Ward argues, and the People dispute, the sentence on count four should have been stayed for the same reason. We conclude the trial court could properly have imposed a concurrent sentence on count four because the evidence, viewed most favorably to the court's sentencing decision and presuming the existence of every fact the court could have reasonably deduced from the evidence, would support an implied finding Ward harbored a separate intent and objective for the assault on Williams than he held for the burglary. (*People v. Blake, supra,* 68 Cal.App.4th at p. 512.) The court could have concluded Ward entered with the intent of attacking Buganan, but not Williams, because he lurked outside until he spotted Buganan peering through the window and only then broke the glass and commenced assaulting Buganan, and he spoke no words nor took any actions suggesting he was also hunting Williams that night, but instead directed his attack solely to Buganan. It was only after Williams rushed in that he released Buganan and turned on Williams, from which the court could have inferred Ward formed the new intent and objective of assaulting Williams. While these events did follow closely, "[i]t is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Hicks, supra,* 6 Cal.4th at p. 789.)

As an independent ground for affirmance, we also note it appears the "multiple victims" exception to section 654 would permit imposition of a separate sentence on

26

count four. There were multiple victims of Ward's attack here, and the courts have observed that multiple punishments are permitted when "the criminal act—that is, the crime of which defendant was convicted . . .—was *defined* by statute to proscribe an act of violence against the person." (*Hall, supra,* 83 Cal.App.4th at p. 1089.) Ward quotes *Hall* for the assertion that " '[b]urglary, standing alone, is not a violent crime for purposes of [applying] the multiple victim exception' " (*Hall, supra,* 83 Cal.App.4th at p. 1090), and argues (citing *People v. Centers* (1999) 73 Cal.App.4th 84, 99) that burglary qualifies as a violent crime for purposes of applying the multiple victim exception *only* if the defendant actually inflicted great bodily injury during the commission of the burglary or personally used a firearm. Although *Centers* cited other cases that held burglary qualifies as a violent crime for purposes of applying the multiple victim exception when the defendant actually inflicted great bodily injury during the commission of the burglary, and ultimately held burglary qualifies as a violent crime for purposes of applying the multiple victim exception when the defendant personally uses a firearm (*id.* at pp. 99-100), *Centers* did *not* hold multiple punishments were improper absent actual infliction of great bodily injury or personal use of a firearm.

The crime of which Ward was convicted in count four is defined as assault *by means of force likely to produce great bodily injury* (§ 245, subd. (a)(4)), and *Neal* specifically stated that permitting separate punishments for an act of violence against multiple victims accords with the underlying purpose of section 654's proscription of "insur[ing] that the defendant's punishment will be commensurate with his criminal

27

liability. A defendant who *commits an act of violence* with the intent to harm more than one person *or by a means likely to cause harm* to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual.' " (*Neal, supra,* 55 Cal.2d at pp. 20-21, quoting *People v. Brannon, supra* 70 Cal.App. at pp. 235-236, italics added.) Because the crime of which Ward was convicted (1) involved a separate victim and (2) involved (by statutory definition) the employment of "means of force likely to produce great bodily injury," the crime appears to fall within *Neal's* rationale for applying the multiple victim exception. We conclude, for both of the above reasons, the sentence of a concurrent term for Ward's conviction on count four was proper.

     G. <u>The Custody Credit</u>

Ward argues he is entitled to one extra day of custody credit on his sentence, and the People dispute that claim. Ward was arrested on May 9, 2012, and was sentenced on May 31, 2013. A defendant is entitled to custody credits for the time served in county jail prior to sentencing, including partial days. (*People v. Rajanayagam* (2012) 211

28

Cal.App.4th 42, 48.) Calculation of custody credit begins on the day of arrest and continues through and including the day of sentencing. (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) There are 388 days starting on May 9, 2012, and ending on May 31, 2013, but Ward was only awarded 387 days of credits. Ward is entitled to an extra day of custody credit.

## DISPOSITION

The judgment is modified as follows: the sentence on count two is stayed pending successful service of the balance of defendant's sentence, at which time the stay shall become permanent. (See *People v. Hall, supra*, 83 Cal.App.4th at pp. 1096-1097.) Additionally, the sentence is amended to reflect defendant is entitled to 388 days of custody credits. As so modified, the judgment is affirmed. The trial court shall prepare a corrected abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

29