Filed 8/6/15  P. v. Mayo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JAMAR MARQUIS MAYO,<br><br>　　Defendant and Appellant. | F068380<br><br>(Fresno Super. Ct. No. F11907197)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Jonathan E. Berger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant claims he was sentenced more harshly than provided in his plea agreement.  The Attorney General contends defendant was not promised any sentencing lid as part of the plea agreement.  We conclude the terms of the plea agreement are ambiguous.  In accordance with the applicable interpretive canon, we construe this ambiguity in defendant's favor.  As a result we will remand with directions that

defendant be permitted to withdraw his plea, if he requests to do so within 30 days of the issuance of the remittitur.[1]

## FACTS

I. Procedural Facts

A. *Charges*

On April 23, 2012, defendant was charged with kidnapping to commit robbery (count I – Pen. Code, § 209, subd. (b)(1)),[2] elder abuse (count II – § 368, subd. (b)(1)), first degree residential robbery (count III – § 211), first degree residential burglary (count IV[3] – §§ 459, 460, subd. (a)), and false imprisonment of an elder adult (count V – § 368, subd. (f).)  As to the kidnapping, robbery and burglary counts, the information alleged the victim was an elder dependent adult.  (§ 667.9, subd. (a).)  As to the burglary count, it was alleged that a nonaccomplice was present in the residence.  (§ 667.5, subd. (c)(21).)

Defendant pleaded not guilty to all counts.

B. *Change of Plea*

On June 6, 2013, a "Felony Advisement, Waiver of Rights, and Plea Form" was filed (hereafter, "change of plea form").  In the form, defendant requested to withdraw his plea of not guilty as to the kidnapping and burglary counts (I and IV), and enter a plea of guilty to those charges.  Defendant also agreed to admit the enhancements to count IV. (§§ 667.9, 667.5, subd. (c)(21).)  In the same area of the form where the counts were listed, there was a handwritten notation reading:  "Plea is straight up."[4]  Under the form's heading "Consequences of Plea of Guilty or No Contest," defendant initialed a box

---

[1] We also address and reject defendant's claim that one of his prison terms should have been stayed under section 654.

[2] All subsequent statutory references are to the Penal Code unless otherwise noted.

[3] The count initially contained no allegations as to defendant, only allegations against codefendant Vincent Alexander Deen.  The charging document was later amended by interlineation to insert defendant's name.

[4] All of the form's handwritten text appears in upper case.

demonstrating that he understood the maximum sentence he could receive as a result of the plea was "9 yrs 4 mos to life."

At a change of plea hearing on the same day, defense counsel informed the court that his client wished to "plead to" counts I and IV, and admit the enhancements on count 4. Defense counsel then said, "And the plea is straight up."

The court asked defendant several questions regarding the change of plea form and whether he understood his constitutional rights. The court then asked: "Do you understand that the maximum period of confinement is … nine years, four months to life?" Defendant responded affirmatively. The court then asked whether anyone promised defendant "that is not set forth in writing on this change of plea form …?" Defendant responded negatively.

The prosecutor and defense counsel stipulated that there was a factual basis for the guilty pleas and admissions, but did not verbally state the factual basis for the plea nor did they identify any particular document or transcript that set forth the factual basis. The prosecutor orally moved to dismiss the remaining counts "in light of the plea."

*C. Sentencing*

Defendant was sentenced on October 11, 2013. At the beginning of the sentencing hearing, the court said it had read and considered the probation report, defendant's statement in mitigation, and sentencing memoranda submitted by the prosecution and defense, including various letters that were attached thereto.

The court then asked whether there were "any additions, corrections, deletions to the probation report?" Defense counsel said there were "only a couple …." Defense counsel asked the court to incorporate into the probation report a letter defendant had written to the court. Counsel also said "the time credits" needed to be updated. Defense counsel identified no other additions, corrections or deletions to the probation report and did not object to the court's consideration of the probation report for any purpose.

3.

The court denied probation. The court sentenced defendant to an aggravated term of six years on the burglary count, plus one year for the elder victim enhancement (§ 667.9, subd. (a)), plus a consecutive term of life in prison with the possibility of parole. The total sentence was one "determinate term of seven years, followed by … one indeterminate term of life with the possibility of parole."

*D.* Facts of the Underlying Crimes[5]

Defendant and codefendant Deen committed several crimes on December 19, 2011. The victim, Jennie Molina ("Jennie"),[6] was 69 years old at the time.

In 2010, Jennie had allowed Deen to live with her for "a couple months" because he did not have a place to stay. Jennie's grandson and Deen went to high school together and were friends. During the time Deen was living with her, Deen stole Jennie's personal checks and wrote approximately $24,000 worth of checks to himself.

_____

[5] In their appellate briefs, both parties base their statement of facts on the preliminary hearing. However, the facts of the underlying crimes are only relevant to the sentencing issue raised by defendant involving section 654. At sentencing, the court indicated that it had reviewed the probation report, but there is no indication the court reviewed the preliminary hearing transcript. (And the sentencing judge did not preside over the preliminary hearing.) We are directed to nothing in the record that suggests the sentencing court relied on, or was even aware of, the evidence offered at the preliminary hearing. Therefore, we base our statement of facts on the probation report. (See, e.g., *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1376, fn. 1; *People v. Sewell* (1989) 210 Cal.App.3d 1447, 1448, fn. 3.)

We note that we need not decide whether a sentencing court should look to the probation report in determining whether section 654 applies if the defendant has not stipulated that the probation report constitutes the factual basis for the plea. (Cf. *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1312; *People v. Johnson* (1984) 162 Cal.App.3d 1003, 1010, fn. 4; but cf. *People v. Ross* (1988) 201 Cal.App.3d 1232, 1238–1241.) Before sentencing the defendant, the court said it had considered the probation report. At no time did the defense object to the court's consideration of the probation report. To the contrary, defense counsel actually requested the court incorporate a letter defendant had written into the probation report. Moreover, defendant does not argue on appeal that the court erred in relying on the probation report at sentencing.

[6] We refer to Ms. Molina and her daughter by their first names because they share a last name; no disrespect is intended.

In February 2011, Jennie's grandson borrowed $4,000 from Deen. Approximately two months prior to the burglary, Jennie's grandson learned Deen had stolen checks from Jennie. Jennie's grandson told Deen he would not pay him back for the $4,000 loan. Jennie's grandson thought Deen did not seem upset.

On December 19, 2011, defendant and Deen broke into Jennie's home. Deen entered the home through a back window. When Jennie arrived at home, defendant knocked on the door to distract her. Defendant asked Jennie if her grandson was home, and she said he was not. Defendant asked Jennie to take down his telephone number. Jennie then walked to her bedroom. Deen opened the door for defendant.

Deen and defendant then attacked Jennie from behind. Deen began to choke Jennie with a pair of her sweatpants but eventually stopped. Defendant and Deen then bound Jennie's mouth, hands and feet with duct tape.

Defendant and Deen carried Jennie to her car in the garage and put her in the trunk. Defendant later said that Deen had "planned on driving the victim's vehicle, with the victim inside, and get out of the city." They placed a television from Jennie's home in the back seat of the same car and hid in the garage.

As the men were moving Jennie to the garage, they heard Jennie's daughter, Delia, returning home at around 3:30 p.m. Delia noticed "that things were 'out of place' " and her son's television was missing from his room. Delia saw bloody clothes in Jennie's bedroom.

A man, later identified as defendant, appeared "out of nowhere" in front of the house. Defendant identified himself as "Robert" and asked for Delia's son. Delia told defendant her son was not home. Defendant asked for a drink of water. Delia let defendant in and gave him a drink of water.

Delia felt uncomfortable when defendant followed her to her son's bedroom. She asked him to leave, and he did. Then Delia called the police.

Defendants fled the scene, leaving Jennie in the trunk.

5.

When officers arrived and walked through the home, they immediately noticed signs of a struggle and a strong odor of bleach.[7] Officers also observed a bloody tissue on the hallway floor and what appeared to be blood stains on the carpet. As they walked through the home, they saw a pair of prescription glasses with a bent frame on the floor, blood-stained clothes and more bloody tissues. Officers discovered Jennie in the trunk of her car, still gagged and bound at the hands and feet.

Jennie had suffered numerous injuries, including: a broken finger, "[b]ruising and swelling around both of her eyes, multiple abrasions, scratches, and swelling to her face and head, cuts and swelling to the insides of her upper and lower lips, a bruise underneath her chin, [and] on her neck, along with scratches and red marks on her neck, bruises on her upper left arm and right forearm, and a dark red mark and a bruise on her left forearm."

**Jennie's Statement**

Immediately after the incident, Jennie gave a statement. Jennie's statement, as summarized by the probation report, differs from the probation report's factual summary in several respects, including how Deen entered Jennie's home. In her statement, Jennie said that she heard a knock at her door. When she answered, a man later identified as defendant was standing at her door. Deen was standing by the street. Defendant asked if Jennie's older grandson was home and said the grandson owed him money. Jennie said the grandson was not home, but that she would take down defendant's number and have the grandson call him. She was unafraid at this point because defendant had asked for the grandson by name. When Jennie turned her back to get a pen and paper, defendant and Deen "forced" their way inside the residence and began "beating" her and trying to suffocate her. Jennie fought back as best she could.

---

[7] Jennie and Delia denied using any bleach products in the home.

6.

**Defendant's Statement**

Defendant also gave a statement to police after his arrest. He admitted that Deen had gone through the back window. He also admitted knocking on the door and asking Jennie if her grandson was home. As she turned to get something to write on, Deen began "wailing" on her. Deen began to "tape her up" and defendant could hear Jennie screaming. Defendant helped Deen put Jennie in the trunk. They heard Delia arrive home, so Deen put the television they had taken in Jennie's vehicle, and they both hid in the garage. Defendant realized his cell phone was still in the home so he went around to the front door and knocked. Defendant was allowed in the residence. He got his cell phone and left. Defendant said Deen's plan was to drive Jennie's vehicle, with Jennie inside, and "get out of the city."

**Deen's Statement**

In his own postarrest statement, Deen said that it was defendant who had "taped her up" and had encouraged Deen to take off with Jennie's car. The probation report says that "[m]any times it sounded like Deen was recalling what he did, but blaming [*sic*] [defendant]."

## DISCUSSION

### I. DEFENDANT MUST BE PERMITTED TO WITHDRAW HIS PLEA

*A. The Terms of the Plea Agreement Are Ambiguous and Must Therefore be Resolved in Defendant's Favor*

Defendant claims the court erred in imposing a sentence that exceeded the maximum exposure identified on his change of plea form.

A defendant may enter a guilty plea "in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment …." (*People v. Walker* (1991) 54 Cal.3d 1013, 1024, overruled on another point by *People v. Villalobos* (2012) 54 Cal.4th 177, 183.) Here, there is a dispute as to what benefits defendant was to receive for his guilty plea. The Attorney General contends defendant agreed to a "charge

7.

bargain, i.e., he agreed to plead guilty to certain charges in exchange for the dismissal of others but did not negotiate a sentence lid or stipulated term …." (*People v. Rushing* (2008) 168 Cal.App.4th 354, 360.)  Defendant, however, claims that the plea agreement provided "he would plead guilty to two counts and admit one enhancement in exchange for the dismissal of the remaining counts and enhancement, *and a maximum sentence of nine years and four months to life*."  (Italics added.)

### 1.  Legal Principles for Ascertaining the Terms of a Plea Agreement

We must determine whether the plea agreement included a negotiated maximum sentence.  As we do so, we are guided by several interpretive principles applicable to plea agreements.

If the terms of a promise in a plea bargain are " ' "…in any respect … uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." [Citations.]' [Citation.]" (*People v. Shelton* (2006) 37 Cal.4th 759, 767.)  " 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]' [Citations.]" (*Ibid.*)

When and if an ambiguity is identified, it is resolved in favor of the defendant, because the proper focus is on what induced the *defendant* to plead guilty.  (*In re Timothy N.* (2013) 216 Cal.App.4th 725, 734; *V.C. v. Superior Court* (2009) 173 Cal.App.4th 1455, 1467, fn. 12, disapproved on another point by *In re Greg F.* (2012) 55 Cal.4th 393, 415; *People v. Toscano* (2004) 124 Cal.App.4th 340, 345.)

Guided by the foregoing rules, we conclude that (1) there is an ambiguity as to whether defendant's maximum exposure as stated on the change of plea form was a term of the plea agreement and (2) that since the ambiguity must be resolved in defendant's

favor, we must deem the maximum exposure language to be a term of the plea agreement.

> 2. Whether the Maximum Exposure Identified in the Change of Plea Form was a Term of the Plea Agreement is Ambiguous

On the change of plea form, defendant indicated that he understood the maximum sentence that he could receive "as a result of my plea" was nine years four months to life.[8]  This language suggests the defendant's guilty plea was entered, at least in part, in exchange for the promise that his maximum exposure would be nine years four months to life.[9]

The Attorney General points to a handwritten notation on the change of plea form that reads:  "Plea is straight up."  The Attorney General contends that the phrase "straight up" means defendant received no promise whatsoever as to his sentence on the counts to which he pled guilty.  We acknowledge that a plausible reading of the phrase "straight up" (perhaps the most plausible one) is that the plea agreement did not include a sentencing lid.  (Cf. *People v. Cobb* (1983) 139 Cal.App.3d 578, 581 [recounting defense counsel's use of phrase "straight up" to indicate unconditional plea].)

However, a contrary interpretation is supported by another aspect of the agreement.  Specifically, the plea form lists defendant's "maximum exposure" at nine years four months to life, which is less than the statutory maximum exposure of seven years, plus life with the possibility of parole.  One reasonable interpretation of this language is that the plea agreement set defendant's maximum exposure below the maximum permitted by statute (i.e., a sentencing lid).

---

[8] The Attorney General "submits that the plea form simply set forth counsel's understanding of appellant's exposure on counts IV and I."  We do not doubt that this language on the plea form set forth counsel's understanding of defendant's exposure.  But the more important question is whether the language also sets forth a negotiated term of the plea agreement.

[9] The parties agree that the defendant's plea was also entered in exchange for, at least in part, dismissal of the remaining counts.

While the phrase "straight up" may militate in favor of the Attorney General's interpretation, the "maximum exposure" entry creates an ambiguity as to whether the plea agreement provides for a sentencing lid.  We must resolve that ambiguity in defendant's favor.  (*In re Timothy N.*, *supra*, 216 Cal.App.4th at p. 734.)

### 3.  Other Considerations Support our Conclusion

Additionally, because the terms of the plea agreement are uncertain, the agreement must be interpreted in the sense the prosecutor and trial court believed defendant understood it.  (*People v. Shelton*, *supra*, 37 Cal.4th at p. 767.)  At the change of plea hearing, the trial court asked defendant, "Did anyone promise you anything that is not set forth in writing on this change of plea form, sir?"  Defendant replied, "No, sir."  The trial court's question indicates the trial court believed defendant understood the change of plea form to set forth the promises he was receiving in exchange for pleading guilty.[10]

Moreover, our Supreme Court has repeatedly encouraged trial courts to "either require defendants to sign a written change of plea form specifying all serious consequences of the plea [citation], or follow an informal "script" in orally taking pleas." (*People v. Walker*, *supra*, 54 Cal.3d at p. 1030; see also *People v. Villalobos*, *supra*, 54 Cal.4th at p. 186; *People v. Crandell* (2007) 40 Cal.4th 1301, 1310.)  Here, defendant did "sign a written change of plea form specifying" that one of the "serious consequences of the plea" was the possibility of being sentenced to nine years four months to life in prison.  Yet, the Attorney General would have us construe this maximum exposure language as "simply set[ting] forth counsel's understanding of [defendant's] exposure" but not actually promising anything.  This would undermine the apparent purpose of the Supreme Court's advisement.

---

**10** The trial court also asked defendant whether he understood his maximum period of confinement is "nine years, four months to life?"  Defendant responded affirmatively.

### B. Defendant's Actual Sentence Significantly Exceeds the Maximum Exposure Contemplated When Defendant Pled Guilty

"When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement. The punishment may not significantly exceed that which the parties agreed upon." (*People v. Walker*, *supra*, 54 Cal.3d at p. 1024.) Defendant contends his punishment did significantly exceed that contemplated by his change of plea form.

Defendant was sentenced to consecutive terms of (1) seven years and (2) life with the possibility of parole. We must determine whether that aggregate sentence exceeds the maximum exposure set forth in the change of plea form, which was "9 years 4 mos. to life." That is, we must compare the two sentences and determine which is greater. If the actual punishment significantly exceeds the maximum punishment identified in the plea agreement, defendant must be permitted to withdraw his plea. (*People v. Walker*, *supra*, 54 Cal.3d at p. 1024.)

At first glance, it seems that comparing a sentence of nine years four months to life on the one hand, to a sentence that includes a term of life with the possibility of parole on the other, is like comparing apples and oranges. But the comparison is made simpler by recognizing that " 'the prison "term" for … indeterminate life sentences with the possibility of parole 'is the actual time served in prison *before* release on parole ....' [Citation.]' " (*People v. Acosta* (2002) 29 Cal.4th 105, 113, original italics, citing *People v. Jefferson* (1999) 21 Cal.4th 86, 95.)

In this case, defendant will necessarily serve at least seven years of his life term before even becoming eligible for release on parole. (§ 3046, subd. (a)(1).) And he will do so after having served the seven years of his determinate sentence. (§ 669, subd. (a); Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2015) § 37.38 [entire determinate sentence served before consecutive indeterminate sentence].) Consequently, the sentence defendant actually received provides for 14 years in prison before parole

eligibility.  In this respect, defendant's sentence was the functional equivalent of 14 years to life.  Yet, he pled guilty with the apparent understanding his maximum exposure was a sentence of nine years four months to life.  Clearly, defendant's actual punishment exceeded the maximum exposure identified in the change of plea form.  As a result, he must be permitted to withdraw the guilty plea.[11]

> C. *Our Approach of Viewing a Life Sentence in the Context of Minimum Time to Parole Eligibility Under Section 3046 is Consistent with People v. Superior Court (Sanchez) (2014) 223 Cal.App.4th 567 (Sanchez)*

The Attorney General contends defendant's characterization of his actual sentence – a characterization we essentially adopt – is unpersuasive.  However, it is entirely appropriate to view a sentence of life with possibility of parole in terms of the minimum incarceration time before parole eligibility.  (E.g., *Sanchez*, *supra*, 223 Cal.App.4th 567; see also *People v. Somnang Kim* (2011) 193 Cal.App.4th 1355, 1359, fn. 2.)

For example, in *Sanchez*, *supra*, 223 Cal.App.4th 567, the defendant agreed to plead no contest to attempted murder in exchange for a sentence of 25 to years to life and dismissal of all other counts.  (*Id.* at p. 570.)  However, the lower court ultimately

---

[11] Defendant requests that we order specific enforcement of the plea agreement by requiring trial court to resentence him in accordance with the plea agreement.  The Attorney General contends that remand with an opportunity to withdraw the plea is the appropriate remedy.  We agree with the Attorney General.  "Specific enforcement is appropriate when it will implement the reasonable expectations of the parties without binding the trial judge to a disposition that he or she considers unsuitable under all circumstances."  (*People v. Mancheno* (1982) 32 Cal.3d 855, 861.)  We have concluded that the terms of the agreement were ambiguous and that the issue must be resolved in defendant's favor.  But that is not equivalent to concluding that the prosecution intentionally agreed to a sentencing lid of nine years four months.  To the contrary, we doubt the prosecution intended to enter such an agreement.  In other words, we do not believe that effectively ordering a sentencing lid of nine years four months to life "will implement the reasonable expectations" (*ibid*) of the prosecution.  Therefore, we decline to order specific enforcement and remand with directions to permit defendant to withdraw his plea in a timely fashion, as described in the disposition.

sentenced defendant to a term of life with the possibility of parole. (*Id.* at p. 571.) The People filed a writ petition in the Court of Appeal challenging the sentence.

The Court of Appeal observed that "[w]hen a guilty [or nolo contendere] plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement. [Citations.] [Citation.]" (*Sanchez*, *supra*, 223 Cal.App.4th at p. 573, internal quotes omitted.) The court further noted that a trial court must impose a sentence "within the limits of" a plea bargain. (*Ibid.*)

The Court of Appeal then proceeded to compare the sentence the defendant actually received (i.e., life with the possibility of parole) with the sentence provided for in the plea agreement (i.e., 25 years to life). The Court of Appeal observed that by sentencing the defendant to life with the possibility of parole, the lower court had "effectively giv[en] defendant a minimum term of just seven years rather than 25. (Pen. Code, § [citation] 3046, subd. (a)(1).)" (*Sanchez*, *supra*, 223 Cal.App.4th at p. 571.) As a result, the sentencing court had imposed a "lesser term of imprisonment" than contemplated by the plea agreement. (*Id.* at p. 573.)

In the present case, we have viewed the life with possibility of parole term in the same way: As functionally equivalent to a term of seven years to life. (See *Sanchez*, *supra*, 223 Cal.App.4th at p. 571 [life with possibility of parole has "effectiv[e] … minimum term of … seven years…"].) And when we add that term to the consecutive seven-year determinate term, the result is a punishment that exceeds the maximum contemplated by the change of plea form.

13.

D. *The Attorney General's Remaining Contentions on this Point are Not Persuasive*

1. If the Nine Years Four Months to Life Term Stated on the Change of Plea was Intended to Set Forth the Statutory Maximum, it was an Understatement of Defendant's Exposure, Not an Overstatement

The Attorney General questions how an apparent *over*statement of defendant's exposure on the burglary and elderly victim enhancement (seven years vs. nine years four months) could be considered detrimental to defendant. First, this contention assumes that the "maximum exposure" language in the change of plea form endeavored to state defendant's statutory maximum exposure, rather than a negotiated sentencing lid. Assuming for argument's sake that assumption is correct, we would nonetheless conclude the plea form did not overstate defendant's total exposure, it understated it.

The *actual* maximum statutory exposure for the crimes defendant pled to was a sentence of seven years *plus* a consecutive life term, not seven years *to* life. (§§ 209, subd. (b)(1) [life with possibility of parole for kidnapping to commit robbery], 461, subd. (a) [six year maximum for first degree burglary]; 667.9, subd. (a) [one year for elderly victim enhancement]; 669, subd. (a) ["Life sentences … may be imposed to run consecutively … with any other term of imprisonment for a felony conviction"].) Seven years plus life is a greater sentence than nine years, four months to life. (See §§ 669, subd. (a), 3046, subd. (a)(1); cf. *Sanchez*, *supra*, 223 Cal.App.4th at pp. 571, 573 [25 years to life greater punishment than life with possibility of parole].) Consequently, even if the change of plea form intended to set forth a maximum *statutory* exposure, it did so by erroneously *under*stating defendant's exposure.

2. Defendant's Actual Sentence was the Functional Equivalent of a Term of 14 years to Life, not 14 Years Plus Life

The Attorney General describes defendant's argument as an "attempt to stack the minimum time he must serve on count I on top of count IV's determinate term in an effort to craft a 14 year determinate term and thereby create a determinate term in excess of what was listed in the plea agreement." However, we understand defendant's

14.

contention to be that his sentence was the functional equivalent of an indeterminate term of 14 years *to* life (not a determinate term of 14 years *plus* an indeterminate term of life). So stated, the contention is persuasive, as we have explained above.

## II. THE TRIAL COURT'S SENTENCE DID NOT VIOLATE SECTION 654[12]

Under section 654, as interpreted by our Supreme Court, a defendant may not be punished more than once for "a single act or omission, or an indivisible course of conduct. [Citations.]" (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent* and *objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, original italics.)

In this case, the trial sentenced defendant "to separate terms without making an express finding the defendant entertained separate objectives …." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) In that circumstance, "the trial court is deemed to have made an implied finding each offense had a separate objective. [Citation.]" (*Ibid*.) We will uphold that implied finding on appeal if supported by substantial evidence. (*Ibid*.)

The question is whether the burglary and kidnapping were incident to "one objective." (*People v. Latimer*, *supra*, 5 Cal.4th at p. 1208.) According to the probation report,[13] defendant admitted that the burglary was done with intent to steal a television and video game console from Jennie's residence. As we will explain, there was

---

[12] Even though we conclude defendant must be permitted to withdraw his plea, we address his argument that his sentence violates section 654. Given our disposition, the judgment will be reinstated if defendant does not request to withdraw his plea. In that circumstance, the issue of whether the sentence violates section 654 remains relevant. And, even if defendant does withdraw his plea, the same issue may arise if defendant is resentenced.

[13] See footnote 5, *supra*.

15.

substantial evidence that the kidnapping was done pursuant to one of several different objectives.

After Deen choked, "brutally" assaulted, bound and gagged Jennie, he and defendant put her in a car trunk in the garage. According to Mayo, Deen intended to "get out of the city" in Jennie's car while she remained in the trunk. This evidence gives rise to several reasonable inferences as to the ultimate objective of the kidnapping.

Deen may have intended to take Jennie away so he could harm her further, just for the sake of inflicting pain. (See *People v. Nelson* (1989) 211 Cal.App.3d 634, 638–639 [stealing and intent to inflict physical harm upon the victims held to be separate objectives under section 654].) The inference that Deen harbored this intent in kidnapping Jennie is also supported by the fact that he had, moments earlier, "brutally" assaulted and choked her, even though those acts were not necessary to complete the burglary.

Or Deen may have intended to harm Jennie or otherwise prevent her from speaking with police in order to ensure he was never caught. (See *People v. Rodriguez* (2015) 235 Cal.App.4th 1000 [trial court could have reasonably concluded objective of obtaining valuables and avoiding being caught were separate for section 654 purposes]; *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1216 [defendant's objective of burglary was to obtain property while objective of assault was to avoid arrest].) This inference is supported by defendant's statement that Deen intended to kidnap Jennie and "get out of the city."

Either way, there was substantial evidence the kidnapping was done pursuant to a separate objective from the burglary.

## DISPOSITION

The judgment is vacated and the matter remanded to the trial court. Defendant shall have 30 days from the issuance of the remittitur to request to withdraw his guilty

plea.  If a timely request is made, the court shall grant it.  If no timely request is made, the court shall reinstate the judgment.

                                              _____

                                              POOCHIGIAN, A. P. J.

WE CONCUR:


_____

DETJEN, J.


_____

PEÑA, J.

17.